[No. B229066. Second Dist., Div. Eight. Sept. 13, 2011.]

In re BRYAN D., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY
SERVICES, Plaintiff and Respondent, v.
T.D., Defendant and Respondent;
BRYAN D., Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of part I.

**COUNSEL**

Daniel G. Rooney, under appointment by the Court of Appeal, for Appellant.

Andrea Sheridan Ordin, County Counsel, James M. Owens, Assistant County Counsel, and Peter Ferrera, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Defendant and Respondent.

**OPINION**

**BIGELOW, P. J.**—The juvenile court asserted jurisdiction over minor Bryan D. Bryan had been living with his maternal grandmother T.D. (grandmother) since he was an infant. On appeal, Bryan contends the trial court erred in denying grandmother's motion to be deemed his presumed mother, or in the alternative, his de facto parent. He also contends there was insufficient evidence to support the juvenile court's assertion of jurisdiction. We reverse the juvenile court's de facto parent determination and otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Bryan first came to the attention of the Orange County Social Services Agency (SSA) in June 2010. At the time, then 12-year-old Bryan was living

with grandmother. The SSA received an anonymous call alleging grandmother had been gone for 12 days and had left Bryan home alone. The caller also reported that grandmother trafficked undocumented people into the United States and was often gone for days at a time, leaving Bryan alone.

A social worker investigated the report and interviewed Bryan at his home. Bryan appeared healthy, free of bruises or marks, and appropriately dressed. He told the social worker he had lived with grandmother since he was three months old and that his mother had been unable to care for him. He said grandmother left for Guerrero, Mexico, 10 or 11 days earlier to see family. He also told the social worker grandmother had once before left him at home for around one week when she went to El Salvador and Guatemala. When the social worker asked who was in charge of him in grandmother's absence, Bryan said their roommate Maria T. and grandmother's brother, Manuel D., were also at the house. Bryan reported that Maria T. fed him in the morning and after school; he said grandmother had not asked Maria T. to watch over him, but grandmother knew Maria T. would do it. Bryan said Manuel D. worked from 3:15 p.m. to 11:30 p.m. Bryan did not have a contact number for grandmother in Mexico. He denied that grandmother trafficked illegal aliens.

The social worker interviewed Maria T. Maria T. said this was the third time grandmother had left Bryan at home alone. In the preceding three months, grandmother had also left Bryan home for a three-day period and again for a week and a half. Maria T. thought grandmother had gone to Los Angeles but did not know where she was. Maria T. denied grandmother had spoken to her about taking care of Bryan in her absence. She admitted she sometimes offered Bryan dinner when she was feeding her own three children because she "[felt] bad not offering," and he never declined. Maria T. left the house at 7:30 a.m. for work and did not return until 7:00 p.m. She did not know if Manuel D. fed Bryan. She also reported that Manuel D. was not home from Saturday until Monday morning. That week, Manuel D. had returned home late on Friday night, picked up Bryan and took him to the home of one of grandmother's daughters, and Bryan returned home late on Sunday. Maria T. did not have contact information for any of Bryan's family members.

The social worker was initially unable to reach Manuel D. on his cell phone. Although he briefly returned home while the social worker was there, he immediately left before the social worker realized he was at the house; he told Bryan and Maria T. he could not stay because he had to go to work. When Manuel D. eventually returned the social worker's call, he told the social worker that grandmother had asked him to take care of Bryan. He took Bryan to school every morning and made sure there was food for him after

school. He understood that Bryan went to a friend's house after school, but he did not know who the friend was or where he or she lived. Manuel D. also said grandmother told him Maria T. was in charge of feeding Bryan, although he did not know if grandmother actually spoke with Maria T. about feeding Bryan every day. He did not know when grandmother planned to return and had no contact information for her. Manuel D. reported he left the home every day at 2:45 p.m., and returned between 10:00 p.m. and 1:00 a.m., but said Bryan was never alone because either he or Maria T. was home.

The social worker also spoke with Bryan's mother, D.D. (mother). Mother told the social worker that she became pregnant with Bryan while in Mexico en route to the United States, but she never told the father that she was pregnant and he had no knowledge of Bryan's existence. Mother was 17 years old when Bryan was born. Mother reported that grandmother beat her while she was pregnant with Bryan. When Bryan was three months old, mother ran away from home to escape grandmother's physical abuse. After mother ran away, grandmother insisted that mother return with Bryan. According to mother, when she returned one month later, grandmother pulled her out of a car by her hair, took Bryan away from her, and took him into her house. Grandmother refused to return Bryan to mother and she eventually left the house without him.

Mother claimed she had periodically asked grandmother to return Bryan but grandmother refused. When Bryan was two years old, grandmother moved to Orange County and mother lost track of them. When Bryan was five years old, grandmother asked mother to sign a form so that he could enroll in school. Mother signed a document but said she did not know what it was. Mother said grandmother had threatened her with "paperwork" when mother tried to take Bryan home, and that grandmother told mother she had given up her parental rights by signing the document. Bryan thought grandmother was his mother until approximately two years earlier when his maternal aunt told him D.D. was his biological mother and grandmother subsequently confirmed this was true.

Mother reported she did not have a good relationship with grandmother and spoke with her only once a month about Bryan. Although Bryan had stayed with her the previous weekend, she did not know grandmother had left for Mexico. When Bryan told mother that grandmother was in Mexico, mother assumed grandmother was in "Tijuana Baja California." She had no information about who was in charge of Bryan in grandmother's absence, and she had no contact number for grandmother in Mexico. Mother lived in Los Angeles and did not know how to drive, so she did not know when she could make it to Orange County to pick up Bryan.

Bryan was taken into protective custody. While the social worker was taking him to a children's home, she overheard him speaking to mother. The social worker reported in the SSA detention report: "It appeared to the undersigned that the mother told the child he would be staying with her permanently because the child repeatedly kept saying 'no, no I want to stay with you only until my grandma comes back.' Eventually the child began to cry while insisting that he wanted to continue living with the maternal grandmother. The undersigned asked the child why he did not want to go live with mother and he stated that 'because it is boring there, and my grandma takes me places and my mom does not go anywhere' 'plus I am use[d] to living with my grandma.' "

The juvenile court in Orange County detained Bryan and placed him with his maternal great-uncle. For a July 2010 jurisdiction and disposition report, a social worker again interviewed him. Bryan said living with his grandmother was "excellent." He was able to talk to grandmother and tell her how he felt, and she bought him things he needed or wanted. When he did something wrong, he and grandmother would have a conversation. Bryan denied any form of abuse. However, he reported he did not like the conflicts between his mother and grandmother that had just started. He explained that mother did not want him when he was a baby and told grandmother she could keep him. Bryan did not want to live with mother permanently because, he explained, "she only wants to get the money that the government gives me, cause I don't feel comfortable living with her, because she didn't want me when I was little."

Bryan said grandmother had gone to Mexico for a funeral, and had left him with Manuel D. and Maria T., to whom he referred as "the renter." Bryan also admitted grandmother had left him in March to go to El Salvador. Grandmother left Bryan with Manuel D., who took him to school every day. Bryan walked home after school and waited for "the renter" to give him food, or he made food for himself. Grandmother bought food for him before she left, and she also left $50 for him if he needed additional food. Bryan said he visited mother around twice per month. He reported that grandmother was the "important person" in his life and that he wanted to live with her.

Grandmother told SSA she had asked Manuel D. and Maria T. to take care of Bryan while she was in Mexico. She gave Maria T. $50 for this purpose and also gave Bryan $50 for food, "just in case." Grandmother reported Maria T. admitted she had lied to the social worker when she denied taking care of Bryan because she was undocumented and feared being deported. According to grandmother, Manuel D. told her he had "taken off" because he thought SSA and the police were after him due to his child support obligations; his ex-wife had recently threatened to report him to the police.

Grandmother said she and mother had never gone to court to formalize her custody of Bryan, but mother signed custody and guardianship letters giving grandmother custody of him. Grandmother provided two of the letters.

Mother told SSA that she had not had the courage to confront grandmother in order to get Bryan back. She again recalled that when she was pregnant with Bryan, grandmother threatened her, hit her, and made her sleep on the floor. Mother admitted she had signed a document when Bryan was five years old so that he could go to school and to the doctor. She denied signing a second letter of custody or guardianship.

SSA recommended the juvenile court sustain the dependency petition and transfer the case to Los Angeles County, where mother lived and where Bryan was now placed with the maternal great-uncle and great-aunt. Mother was not present at the jurisdiction hearing. She submitted on the petition through counsel. The petition alleged grandmother left Bryan with no care-taker or provision for support for at least 10 days and had not left a contact number where she could be reached. The petition further alleged grandmother had previously left Bryan without adequate supervision or provision for support and that her actions placed Bryan at risk. The petition alleged mother knew or reasonably should have known grandmother was leaving Bryan unsupervised and that mother failed to protect Bryan, thereby placing his health and safety at risk. The petition also alleged mother had failed to maintain a consistent relationship with Bryan, failed to provide for his basic needs, and she should have known he was at risk of being physically abused by grandmother since grandmother had physically abused her, yet she took no action to protect him.[1]

The juvenile court asserted jurisdiction over Bryan and transferred the case to Los Angeles County. Grandmother subsequently filed a request that she be considered Bryan's de facto parent. At a September 2010 hearing in the Superior Court for Los Angeles County, the court appointed counsel for grandmother. The court indicated it would grant grandmother's de facto parent application, but mother objected. The court then stated it understood grandmother would be seeking presumed parent status and asked counsel to file a noticed motion.

In the meantime, the Los Angeles County Department of Children and Family Services (DCFS) filed a disposition report. According to the report,

---

[1] Although mother reported she had never told Bryan's father she was pregnant, he did not know of Bryan's existence, and she had no information regarding his whereabouts, the petition also included allegations that the father knew or should have known Bryan was at risk for neglect in grandmother's care and that he had failed to maintain a relationship with Bryan, or provide for his basic needs.

mother regretted not seeking legal custody of Bryan sooner. Mother was "aware her son considers his grandmother to be his mother but she would like the opportunity to gain his trust and love." Grandmother told DCFS she too regretted never securing legal custody of Bryan. She also told DCFS "she is the only mother Bryan has ever known [and] it saddens her to think that he could be taken away so abruptly." Since mother had never wanted Bryan, grandmother never thought to try to get legal custody of him. She denied that she physically abused mother or that she took Bryan without mother's consent. Grandmother continued to maintain that she left Bryan with Manuel D. and Maria T., and that they did not admit they were in charge of him because they feared the police. She also said Manuel D. had her contact information in Mexico.

Bryan told DCFS "he considers his maternal grandmother to be his mother because she has raised him his whole life. He states that he knows his biological mother and he cares about her and would like to continue having a relationship with his mother but wants to return to the care of his grandmother." He said he had known "for a long time who his biological mother was but can't recall how he found out."

In October 2010, grandmother and Bryan filed written motions asking the court to deem grandmother Bryan's presumed mother. Grandmother submitted a supporting declaration in which she represented she had cared for Bryan since his birth and was his sole caretaker until he was removed by SSA. Grandmother declared she had provided Bryan with all necessities, including shelter, education, food, and clothing, and she ensured he received medical care, including all immunizations. Grandmother detailed where Bryan had attended school and indicated she met with all of his teachers and attended all open houses and parent-teacher conferences. She paid for daycare when Bryan was an infant and she was working. She also provided for Bryan's recreation and entertainment. Bryan spent time with grandmother's family members, including his great-grandparents, and family in El Salvador and Texas, as well as with Bryan's aunt in Oregon. Grandmother stated members of their community witnessed the care she provided to Bryan.

In his motion, Bryan argued grandmother had cared for him since he was an infant because mother was not interested in taking care of him. He asserted he wished to return to live with grandmother, and that he considered grandmother his "actual and psychological" parent.

Mother opposed the motions, contending grandmother could not properly be deemed a presumed mother under Family Code section 7611, subdivision (d).

In November 2010, DCFS filed an interim review report. According to the report, in September 2010, mother told DCFS she would not fight grandmother for custody of Bryan. Mother said grandmother had threatened to have her deported if she continued to seek custody of Bryan. Mother feared grandmother and worried she could not provide for her children if she was deported to El Salvador. However, in October 2010, mother told DCFS she was attending parenting and individual counseling, and her therapist encouraged her to continue seeking custody of Bryan. Mother said she would like the opportunity to build a relationship with Bryan. Bryan continued to tell DCFS he wished to return to grandmother's home although he also wanted to have a relationship with mother.

DCFS reported significant animosity between mother and grandmother. DCFS opined that Bryan had been unable to build a close relationship with mother because grandmother was "over possessive." DCFS recommended mother receive family reunification services, and that grandmother receive "family reunification like services," including that she be ordered to participate in a parenting program, individual counseling, and conjoint counseling with mother and Bryan.

At the November 2010 disposition hearing, the court heard the presumed mother motions. By this time, Bryan was 13 years old. The court denied both the presumed mother and de facto parent motions and relieved grandmother's counsel.

In its dispositional rulings, the court ordered DCFS to make efforts to process a waiver so that grandmother might be considered as a relative placement for Bryan. The court ordered DCFS to provide reunification services to mother, but denied Bryan's request that grandmother receive similar services. However, the court ordered DCFS to facilitate conjoint counseling for Bryan, mother, and grandmother. Grandmother was to have "reasonable, monitored visits," and DCFS had the discretion to liberalize those visits.

This appeal followed.

## DISCUSSION

I. *Substantial Evidence Supported the Juvenile Court's Jurisdictional Findings*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

[*]See footnote, *ante*, page 127.

II.  *The Juvenile Court Properly Denied Grandmother Presumed Mother Status but Erred in Denying Her De Facto Parent Status*

Bryan contends the juvenile court erred in denying grandmother status as his presumed mother, or in the alternative, de facto parent status. DCFS has declined to take a position on either issue. Neither mother nor grandmother has entered an appearance in this appeal.[2] We conclude substantial evidence supported the juvenile court's presumed mother finding, but the court abused its discretion in denying grandmother de facto parent status.

A.  *Substantial Evidence Supported the Juvenile Court's Ruling Denying Grandmother Presumed Mother Status*

■ "Under the dependency law scheme, only mothers and presumed parents have legal status as 'parents,' entitled to the rights afforded such persons in dependency proceedings, including standing, the appointment of counsel and reunification services. [Citations.] In an appropriate case, a man or a woman who is not a child's biological parent may be deemed his or her 'presumed parent.' [Citations.]" (*In re M.C.* (2011) 195 Cal.App.4th 197, 211 [123 Cal.Rptr.3d 856] (*M.C.*).)

■ California's Uniform Parentage Act, Family Code section 7600 et seq., sets forth how a parent and child relationship may be established.[3] Under section 7610, subdivision (a), "[b]etween a child and the natural mother, it may be established by proof of her having given birth to the child, or under this part." Under section 7610, subdivision (b), "[b]etween a child and the natural father, it may be established under this part." Section 7611 lists several rebuttable presumptions of paternity, many of which relate to the man's marriage or attempted marriage to the natural mother. However, under section 7611, subdivision (d), a man may be presumed a child's father if he "receives the child into his home and openly holds out the child as his natural child."

■ Although section 7611, subdivision (d) refers to "paternity," it is now well established that the provision, along with other provisions of the Uniform Parentage Act, may also apply to women under some circumstances. Section 7650, subdivision (a) provides: "Any interested person may bring an action to determine the existence or nonexistence of a mother and child relationship. Insofar as practicable, the provisions of this part [(Uniform Parentage Act)] applicable to the father and child relationship apply." Thus, in the context of same-sex relationships involving two women, courts have

---

[2] We agree with Bryan that he has standing to raise these issues on appeal. (*In re Karen C.* (2002) 101 Cal.App.4th 932, 935–936 [124 Cal.Rptr.2d 677].)

[3] All further statutory references are to the Family Code, unless otherwise noted.

found a child may have a biological mother and a presumed mother, to the extent the woman who is the nonbiological parent meets the requirements of one or more of the presumptions listed in section 7611. (*Elisa B. v. Superior Court* (2005) 37 Cal.4th 108, 119–123, 125 [33 Cal.Rptr.3d 46, 117 P.3d 660]; *M.C., supra,* 195 Cal.App.4th at pp. 213, 216.) Further, in other situations in the dependency context, courts have found a woman who is not the biological mother may be deemed a presumed mother under section 7611, subdivision (d). (*In re Karen C., supra,* 101 Cal.App.4th at p. 938 [biological mother gave child to another woman at birth; other woman was the only parent child had ever known and could be deemed her presumed mother]; *In re Salvador M.* (2003) 111 Cal.App.4th 1353, 1358–1359 [4 Cal.Rptr.3d 705] (*Salvador M.*) [after biological mother died, child's half sister raised him as her own and was deemed his presumed mother].)[4]

However, in nondependency contexts, some courts have concluded section 7611, subdivision (d) will not apply to deem a woman a child's presumed mother where the biological mother is present and asserts an interest in the matter, such that there are competing maternity claims. (*Scott v. Superior Court* (2009) 171 Cal.App.4th 540, 544–545 [89 Cal.Rptr.3d 843] [in a Uniform Parentage Act matter there can only be two parents, not three; in a same-sex relationship there may be two mothers, but in a heterosexual relationship there can be only one mother]; *Amy G. v. M.W.* (2006) 142 Cal.App.4th 1, 13–14 [47 Cal.Rptr.3d 297], superseded in part by statute as noted in *M.C., supra,* 195 Cal.App.4th at pp. 222–223, fn. 13 [biological father's wife could not be deemed the presumed mother since the biological mother sought a parental relationship and custody].)

We need not decide whether the juvenile court could properly apply section 7611, subdivision (d) to give grandmother presumed mother status. Even if section 7611, subdivision (d) applied, we would still conclude substantial evidence supported the ruling denying grandmother presumed mother status. (*M.C., supra,* 195 Cal.App.4th at p. 213 [juvenile court's determination of presumed parentage status reviewed for substantial evidence].)

As noted above, under section 7611, subdivision (d), a person may be deemed a "presumed parent" if he or she receives the child into his or her home and openly holds out the child as his or her natural child. There is no dispute that grandmother received Bryan into her home. It is also undisputed

---

[4] Bryan relies on *K.M. v. E.G.* (2005) 37 Cal.4th 130 [33 Cal.Rptr.3d 61, 117 P.3d 673], to support his argument, but the case is inapposite. *K.M.* involved the parentage claims of a woman who had supplied ova to her female partner, resulting in a pregnancy and the birth of twins. The court found the ova donor was a mother of the twins based on her genetic relationship with them and the couple's intention to raise the children in their joint home. (*Id.* at pp. 138–139.) The court expressly declined to consider whether the ova donor was a presumed mother under section 7611, subdivision (d). (*K.M.,* at p. 144.)

that grandmother performed all parental responsibilities for him. However, there was no evidence that grandmother was openly holding Bryan out as her *son*, rather than as her grandson. Both grandmother and Bryan indicated that grandmother was like a mother, or acted as his mother. But in all of the interviews of Bryan, he referred to grandmother as his grandmother, not his mother. He visited with mother periodically and knew she was his mother. In the declaration grandmother submitted to support her presumed parent motion, she did not indicate that she ever held herself out as Bryan's mother.

The only evidence in the record even suggesting grandmother held Bryan out as her natural child came from mother's interviews with SSA and DCFS. Mother told SSA and DCFS that Bryan believed grandmother was his mother until he was nine years old, when his maternal aunt told him grandmother was not his mother. Bryan told DCFS he had known the identity of his biological mother for a long time, but he did not remember how he found out. Even if Bryan at some point believed grandmother was his mother, this was no longer true, and had not been true for years before the dependency proceedings began.[5]

▆ In *In re Jose C.* (2010) 188 Cal.App.4th 147 [114 Cal.Rptr.3d 903] (*Jose C.*), this court recently considered the claim of a child's grandfather that he should be deemed the child's presumed father. Although we found the grandfather had forfeited the claim by failing to raise it below, we also noted that we would reject the claim even if it had been preserved for review. We reasoned that although the grandfather had acted as the "functional equivalent" of the child's father, "that alone does not satisfy the test for presumed father status. Many people may perform the function of a parent at various points in a child's life, including grandparents, stepparents, foster parents, extended family members, and so on. Doing so does not make any of them a presumed parent. That status is defined by statute, and it includes openly holding out the child as one's natural child. (Fam. Code, § 7611, subd. (d).) Grandfather has never done so." (*Jose C.*, at p. 162.)

---

[5] This case therefore differs from *Salvador M.*, in which the child's half sister was deemed his presumed mother. In *Salvador M.*, the half sister had for the most part held the child out as her son. Only the half sister's family and school officials knew the half sister was not the child's natural mother. The child was eight years old. He still believed the half sister was his mother and referred to her as "mom" when speaking with the social worker. (*Salvador M., supra*, 111 Cal.App.4th at p. 1356.) The appellate court found the most compelling evidence supporting a presumed mother finding was that the child believed the half sister was his mother and, "[a]t his age, Salvador would not still believe appellant was his mother unless she so represented herself." (*Id.* at p. 1358.) In this case, Bryan knows grandmother is not his mother, and he has known the identity of his biological mother since at least age nine. Further, unlike the half sister in *Salvador M.*, grandmother presented no evidence that she held Bryan out to the community as her natural son.

Our reasoning in *Jose C.* applies equally here. It was undisputed that grandmother had raised Bryan and provided for him as a parent would. However, there was no evidence that grandmother was openly holding herself out in her community as Bryan's mother. Thus, the trial court properly denied her presumed mother status.

B. *The Juvenile Court Abused Its Discretion in Denying Grandmother De Facto Parent Status*

█ "A de facto parent is 'a person who has been found by the court to have assumed, on a day-to-day basis, the role of parent, fulfilling both the child's physical and psychological needs for care and affection, and who has assumed that role for a substantial period . . . .' [Citations.] The denial of a petition for de facto parent status is reviewed for abuse of discretion. [Citation.] 'In most cases, the lower court does not abuse its discretion if substantial evidence supports its determination to grant or deny de facto parent status.' [Citation.]" (*In re Jacob E.* (2004) 121 Cal.App.4th 909, 919 [18 Cal.Rptr.3d 15] (*Jacob E.*).)

De facto parent status "provides a nonbiological parent who has achieved a close and continuing relationship with a child the right to appear as a party, to be represented by counsel, and present evidence at dispositional hearings. Absent such status, very important persons in the minor's life would have no vehicle for 'assert[ing] and protect[ing] their own interest in the companionship, care, custody and management of the child' (*In re B.G.* [(1974)] 11 Cal.3d 679, 693 [114 Cal.Rptr. 444, 523 P.2d 244]) and the court would be deprived of critical information relating to the child's best interests." (*In re Patricia L.* (1992) 9 Cal.App.4th 61, 66 [11 Cal.Rptr.2d 631], italics omitted.) De facto parent status is ordinarily liberally granted on the theory that a court only benefits from having all relevant information on the best interests of the child. However, the determination depends on the specific circumstances of each case. (*Ibid.*; *In re D.R.* (2010) 185 Cal.App.4th 852, 864 [110 Cal.Rptr.3d 839] (*D.R.*).)

█ The factors courts generally consider for determining de facto parent status include "whether (1) the child is 'psychologically bonded' to the adult; (2) the adult has assumed the role of a parent on a day-to-day basis for a substantial period of time; (3) the adult possesses information about the child unique from other participants in the process; (4) the adult has regularly attended juvenile court hearings; and (5) a future proceeding may result in an order permanently foreclosing any future contact [between the adult and the child]." (*In re Patricia L., supra*, 9 Cal.App.4th at pp. 66–67; see *D.R., supra*, 185 Cal.App.4th at p. 864.)

These five factors supported a grant of de facto parent status to grandmother in this case. Bryan was psychologically bonded to grandmother. He consistently maintained that he wanted to live with grandmother and that he considered her his "mother" because she had raised him. Indeed, it was undisputed that grandmother had solely raised Bryan since infancy. Grandmother was the only adult who had information about Bryan and his upbringing, including information such as school records and medical information. She had regularly attended juvenile court hearings. And there was a risk that future proceedings could result in an order that would permanently foreclose future contact between grandmother and Bryan, particularly in light of the acrimony between mother and grandmother.

■ However, a person who otherwise qualifies for de facto parent status may become ineligible by acting in a manner that is fundamentally inconsistent with the role of a parent. In *In re Kieshia E.* (1993) 6 Cal.4th 68 [23 Cal.Rptr.2d 775, 859 P.2d 1290] (*Kieshia E.*), the California Supreme Court explained that "any adult who causes the onset of dependency proceedings by committing sexual or other serious physical abuse upon a child in his charge has betrayed and abandoned, not embraced, 'the role of parent.' That adult has undermined, not 'fulfill[ed,] the child's physical needs and his psychological need for care and affection.' [Citations.] When the perpetrator is one who lacks the inherent rights of a parent, no legitimate interest remains which would entitle the perpetrator to share in legal decisions about the victim's future care and welfare which were made necessary by the misconduct. By acting in a manner so fundamentally inconsistent with the parental role, the perpetrator forfeits any opportunity to attain the legal status of de facto parent and its attendant privilege of participation and advocacy." (*Id.* at p. 78.) In *Kieshia E.*, dependency jurisdiction was based on the would-be de facto parent's repeated sexual molestation of the child. (*Id.* at pp. 71–72.)

■ The *Kieshia E.* court disapproved of *In re Rachael C.* (1991) 235 Cal.App.3d 1445 [1 Cal.Rptr.2d 473], in which the Court of Appeal held "in essence that the misconduct of a child's nonparental caretaker is irrelevant to the interests and policies favoring the caretaker's limited right of participation in dispositional proceedings." (*Kieshia E., supra,* 6 Cal.4th at p. 78.) Instead, the court concluded: "Once there is an adjudication that a child is within the jurisdiction of the juvenile court because a nonparental caretaker committed a substantial harm, such as sexual or other serious physical abuse, which is fundamentally at odds with 'the role of parent,' the perpetrator's 'protectible interest' in dispositional decisions is extinguished. Moreover, the views and evidence the perpetrator might offer are, as a matter of law, insufficiently relevant to justify standing to participate in proceedings on that issue. By an intentional act, the perpetrator has rejected the function of ongoing parental nurturer which is crucial to the privilege of participation as a de facto parent." (*Ibid.*)

The court summarized its ruling in this way: "All we decide today is that a nonparent who commits sexual or other serious physical abuse upon a child in his or her charge thereby abandons the function of care, affection, and psychological fulfillment essential to the role of a de facto parent. When a juvenile court has found that the nonparent committed such abuse, and has therefore deemed it necessary to make the victim a dependent of the court, the abuser is barred from intervening in the same proceeding under the de facto parenthood doctrine. The abuser forfeits the opportunity to appear as a party, be represented, and give evidence about disposition in a dependency proceeding caused by the misconduct." (*Kieshia E., supra*, 6 Cal.4th at pp. 79–80.)

Here, the juvenile court indicated it was denying grandmother de facto parent status because "[u]nder the statutory structure of de facto parent, a parent—a person who has a sustained petition in this case, specifically, cannot be a de facto parent." But in our view, *Kieshia E.* does not stand for the proposition that any time the conduct of a person who would otherwise qualify as a de facto parent directly or indirectly causes the initiation of dependency proceedings, that person is automatically ineligible for de facto parent status, regardless of the nature of the conduct. *Kieshia E.* explicitly focused on "sexual or other serious physical abuse" that led to dependency proceedings. Subsequent cases have extended *Kieshia E.*'s analysis to conduct other than sexual or physical abuse, but these cases still concern serious and substantial harms to the children involved.

For example, in *In re Michael R.* (1998) 67 Cal.App.4th 150, 157–158 [78 Cal.Rptr.2d 842], the grandmother allowed her grandchildren's physically abusive father unsupervised access to them, she refused to acknowledge that the father was abusive, and she took the children out of state and hid them to avoid a social services removal. In *Jacob E.*, the grandmother failed to act as a parent when she did not enroll her grandson in school, failed to seek appropriate medical and dental care for him, hit him with a stick, exposed him to domestic violence, and refused to cooperate with the social services agency. (*Jacob E., supra*, 121 Cal.App.4th at p. 920.) These were serious and substantial harms fundamentally incompatible with the parental role. Similarly, in *In re Leticia S.* (2001) 92 Cal.App.4th 378, 382–383 [111 Cal.Rptr.2d 810] (*Leticia S.*), the would-be de facto parent hit the child and left narcotics within her reach. In *In re Merrick V.* (2004) 122 Cal.App.4th 235 [19 Cal.Rptr.3d 490] (*Merrick V.*), the grandmother was denied de facto parent status after she left her grandchildren with their mother, who was a known drug addict. Two of the children—two-year-old twins—were later discovered wandering in the street, wearing dirty diapers, and they tested positive for illegal drugs. (*Id.* at p. 242.) A 12 year old was also left without any guidance or supervision except during the time he was in school, and his school attendance was inconsistent. He had insect bites on his chest from sleeping on

the floor at his mother's friend's home, he arrived at school late or at odd hours, and was also seen on the roof of the school cafeteria. (*Ibid.*)

In contrast to the above cases, grandmother's conduct here was not equivalent to "sexual or other serious physical abuse." Grandmother's child-care arrangements for Bryan were inadequate. Further, grandmother either did not leave her contact information with those she left in charge, or they denied having the information when it was critical that they reveal they had it. Yet, when SSA got involved, Bryan was healthy and appropriately dressed. From what the social worker could see of the house, it was "clean and adequately furnished." Manuel D. said grandmother had asked him to take care of Bryan, and he apparently did so except when he was at work in the afternoon and evenings.

Moreover, Bryan was 12 years old, not an infant. Unlike the 12 year old in *Merrick V.*, Bryan was not marked or bruised in any way. There was no evidence that he had missed any school, was late to school, or was in places he should not have been.[6] He had successfully completed the seventh grade and had just gone on summer vacation the day he was detained. There was no evidence grandmother or anyone else ever hit Bryan. There was no evidence grandmother engaged in any intentional acts that put Bryan at any risk of serious physical harm akin to sexual or other physical abuse.

We acknowledge that in *Leticia S.*, the court at one point describes *Kieshia E.* as holding "that if an applicant for de facto parent status is a cause for the dependency proceedings, the application must be denied." (*Leticia S., supra*, 92 Cal.App.4th at p. 383.) Elsewhere in the opinion, however, the court quotes *Kieshia E.*'s actual language which is that " '[o]nce there is an adjudication that a child is within the jurisdiction of the juvenile court because a nonparental caretaker committed a substantial harm, such as sexual or other serious physical abuse, which is fundamentally at odds with "the role of parent," the perpetrator's "protectable interest" . . . is extinguished.' ([*Kieshia E.*], *supra*, 6 Cal.4th at p. 78.)" (*Leticia S.*, at pp. 382–383.) We respectfully disagree with the *Leticia S.* court to the extent it characterizes *Kieshia E.* as holding that an applicant for de facto parent status becomes automatically ineligible if the applicant's conduct is a cause for the dependency proceeding, *regardless of the nature of the conduct in question.*

Similarly, in *D.R.*, the court noted: "An applicant for de facto parent status is automatically disqualified if he or she caused harm to the minor.

---

[6] In *Merrick V.*, the court acknowledged that the question of the grandmother's ineligibility for de facto parent status as to the 12 year old was closer than it was for his toddler siblings, given the lengthier relationship he had with the grandmother, and the fact that he was at less risk of substantial harm than his siblings because of the significant difference in their ages. (*Merrick V., supra*, 122 Cal.App.4th at p. 258.)

([*Merrick V.,*] *supra,* 122 Cal.App.4th at p. 257.) The abuser forfeits the opportunity to appear as a party, to be represented, and to give evidence about an appropriate disposition in a dependency proceeding *caused* by that person's misconduct. (*Kieshia E., supra,* 6 Cal.4th at p. 80; see [*Leticia S.,*] *supra,* 92 Cal.App.4th at pp. 382–383.)" (*D.R., supra,* 185 Cal.App.4th at p. 862.) But elsewhere in the opinion, the *D.R.* court summarized the *Kieshia E.* holding as preventing a nonparent from obtaining de facto parent status if the juvenile court determines the minor is a dependent child because of the nonparent's sexual or serious physical abuse of the child. (*D.R.,* at pp. 860–861.) The *D.R.* court also doubted that *Kieshia E.* applied to the facts before it—a termination of de facto parent status rather than an initial application—and further concluded that even if *Kieshia E.* applied, the juvenile court properly concluded the de facto parent's single incident of serious physical abuse did not trigger mandatory loss of de facto status. (*D.R.,* at pp. 862–863.) Thus, we do not read *D.R.* as expanding the reach of *Kieshia E.* to prohibit a grant of de facto parent status to an applicant whose conduct is a cause of the dependency proceedings, irrespective of the nature of the conduct.

*In re Vincent C.* (1997) 53 Cal.App.4th 1347 [62 Cal.Rptr.2d 224] (*Vincent C.*) is instructive. In *Vincent C.,* the Court of Appeal reversed a denial of de facto parent status to a grandmother who had been caring for her grandchildren after dependency proceedings were initiated. The grandmother had become unable to control the grandchildren. DCFS filed a supplemental petition alleging the grandmother was no longer able to care for the children and had placed them in " 'endangering situations' " by making disparaging remarks about their mother, allowing an uncle with mental problems to visit the home and exhibit irrational behavior, and disrupting the children's class at school. (*Id.* at p. 1353, fn. 2.) The grandmother and other parties stipulated to the supplemental petition, which the juvenile court sustained. (*Id.* at p. 1355.) The juvenile court subsequently denied the grandmother's motion seeking de facto parent status.

The Court of Appeal found the juvenile court abused its discretion in denying the motion. The appellate court concluded the factors favoring de facto parent status were present in the case and there was no evidence the grandmother had committed a substantial harm to the children. As such, the court noted that "where a grandparent or other close relative has cared for a dependent child for an extended period of time and has never done anything to cause substantial or serious harm of any kind to that child, there ought to be a very good reason for denying de facto status—particularly where, as here, the caretaker concedes that she is no longer able to care for the children herself and simply asks to be heard regarding their future placements." (*Vincent C., supra,* 53 Cal.App.4th at p. 1358.)

Unlike the court in *Vincent C.*, we cannot say that grandmother is entirely blameless. Her conduct was a cause of the dependency proceedings. But, under *Kieshia E.*, there must be evidence that the "nonparental caretaker committed a substantial harm, such as sexual or other serious physical abuse, which is fundamentally at odds with 'the role of parent' . . . ." (*Kieshia E., supra*, 6 Cal.4th at p. 78.) There was no evidence grandmother subjected Bryan to sexual or physical abuse. Grandmother's failure to make more appropriate short-term childcare arrangements for Bryan was not an abandonment or betrayal of the role of parent in the way sexually or physically abusing a child is a complete rejection of the role of parent. (*Ibid.*) Grandmother demonstrated poor judgment that placed Bryan at risk of harm, but her failures were not fundamentally at odds with the role of parent in the manner of the mother's boyfriend who sexually abuses the child, the grandmother who gives a known abuser access to her grandchildren, the grandmother who fails to enroll her grandson in school or take him to the doctor, or the grandmother who leaves her grandchildren with their drug-addicted mother who repeatedly demonstrates herself unable to care for them properly.

■ We also note that a de facto parent is "not considered a parent or guardian for purposes of the dependency law. [Citations.] Therefore, the de facto parent is not entitled to all of the rights accorded to persons who occupy the status of parent or guardian." (*In re Jody R.* (1990) 218 Cal.App.3d 1615, 1628 [267 Cal.Rptr. 746]; see Cal. Rules of Court, rule 5.534(e).) A de facto parent is not entitled, as a matter of right, to custody of the child, reunification services, or visitation. (*Kieshia E., supra*, 6 Cal.4th at p. 77, fn. 7; *In re P.L.* (2005) 134 Cal.App.4th 1357, 1361 [37 Cal.Rptr.3d 6].) De facto parent status merely allows a person who has assumed the role of parent of a child to participate in the court hearings and share their "legitimate interests and perspectives" with the juvenile court as it makes decisions about the child's future care and welfare. (*Kieshia E.*, at pp. 77–78.) Granting de facto parent status does not mean the child will be placed with the de facto parents. The status merely provides a way for the de facto parent to stay involved in the dependency process and provide information to the court.

■ We conclude that under the circumstances of this case, the juvenile court abused its discretion in denying grandmother de facto parent status because there was no substantial evidence that she had betrayed or abandoned the parental role, that she had subjected Bryan to serious abuse, that she had inflicted substantial harm on Bryan, or that she had acted in a manner fundamentally inconsistent with the parental role such that she lost the privilege of participation in proceedings concerning Bryan. The lack of such substantial evidence is implicitly acknowledged in the juvenile court's order that DCFS make efforts to process a waiver for grandmother so that she could

be considered as a relative placement for Bryan,[7] the juvenile court's order that grandmother participate in counseling with mother and Bryan, and the court's further order that grandmother have visits with Bryan. In the absence of *Kieshia E.*-type evidence, the juvenile court is to liberally grant a de facto parent motion for a person who qualifies for de facto status, which grandmother indisputably did. (*In re Michael R., supra*, 67 Cal.App.4th at p. 155.) We therefore reverse the juvenile court's order denying grandmother de facto parent status.

## DISPOSITION

The juvenile court's order denying grandmother de facto parent status is reversed. In all other respects, the judgment is affirmed.

Rubin, J., and Grimes, J., concurred.

---

[7] The discussion regarding a "waiver" appeared to refer to the assumption that on the basis of the sustained petition, grandmother would now be listed in California's Child Abuse Central Index. (See Pen. Code, § 11170; Welf. & Inst. Code, § 361.4, subd. (c) [whenever a child may be placed in the home of a relative who is not a licensed foster parent, the social worker must first check the Child Abuse Central Index].)