Filed 4/11/16  In re B.P. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re B.P. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,  Plaintiff and Respondent,  v.  L.G.,  Defendant and Appellant. | E063800  (Super.Ct.No. RIJ1300425)  OPINION |

APPEAL from the Superior Court of Riverside County.  Tamara L. Wagner, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed in part, reversed in part, and remanded with directions.

Law Offices of Vincent W. Davis & Associates and Stephanie M. Davis for Defendant and Appellant.

1

Gregory P. Priamos, County Counsel, James E. Brown, Guy B. Pittman and Carole Nunes Fong, Deputy County Counsel, for Plaintiff and Respondent.

L.G. (grandmother) is the paternal grandmother of the two children who are the subject of this dependency proceeding — B.P., a three-year-old boy, and A.P., a two-year-old girl. During the dependency, B.P. was placed with the grandmother for about a year and a half; A.P. was never placed with the grandmother, but the grandmother did have unsupervised visitation with her. The Department of Public Social Services (Department) removed B.P. from the grandmother when it learned that she was allowing her adult children to have access to her home, contrary to its instructions to her and her assurances to it. B.P. was then placed in the same home as A.P., with foster parents who wanted to adopt both of them.

In this appeal, the grandmother contends that the juvenile court erred by denying her "changed circumstances" petition pursuant to Welfare and Institutions Code section 388 (section 388), in which she asked to have both B.P. and A.P. placed with her. She also contends that the juvenile court erred by denying her de facto parent requests as to both B.P. and A.P.

We will hold that the grandmother made a prima facie showing that she was entitled to de facto parent status with regard to B.P.; therefore, the juvenile court erred by denying that request without a hearing. We will remand with directions to hold a hearing on that request. Otherwise, we find no error.

2

# I

## FACTUAL AND PROCEDURAL BACKGROUND

A.     *The Dependency as to B.P.*

J.F. (mother) and B.P., Sr. (father) are the parents of B.P. and A.P.

In April 2013, when the mother gave birth to B.P., he tested positive for amphetamines.  Both parents were homeless and using methamphetamine.  The father was in jail.  Accordingly, the Department detained B.P. and filed a dependency petition regarding him.

In June 2013, the juvenile court found that it had jurisdiction.  It formally removed B.P. from the parents' custody and ordered reunification services.

B.     *The April 2014 Referral.*

Initially, B.P. was placed in foster care.  Both parents wanted him placed with the grandmother.  However, various issues delayed the placement:  one of the grandmother's adult sons, J.P., had a criminal conviction, plus the grandmother worked for the Department, which meant that she had to be investigated by another county's social services agency.

In July 2013, the father was released from jail.  For a time, he moved in with the grandmother, which further delayed B.P.'s placement with her.

In August 2013, the grandmother signed a declaration stating that her adult sons J.P. and A.P. were no longer living with her; the only people living in her home were her, her boyfriend, and her adult son G.P.  Based on her declaration, only these three were

required to live-scan. The grandmother had a criminal conviction for which she required and she received an exemption. G.P. had a drug-related criminal conviction but also received an exemption. The grandmother was told that no one else could live in the home unless the Department was informed and that person was live-scanned.

In October 2013, B.P. was placed with the grandmother. The social worker told her not to let the father have any contact with the child.

In February 2014, at the six-month review hearing, the juvenile court terminated reunification services and set a section 366.26 hearing.

In April 2014, the Department received a referral alleging that the father was at the grandmother's house "all the time" and that he and other male adults in the house were selling drugs. When it investigated, the grandmother admitted that, contrary to her declaration, J.P. and A.P. had continued to live with her until September 2013. She also admitted that they had keys to the house and typically visited every day or two. She was told again that any adult who had "regular contact" with the home would have to live-scan and be approved by the Department.

The grandmother also disclosed that G.P. had been arrested and charged with a new drug-related crime. A social worker interviewed him; he said that he planned to move out in about six months.

In June 2014, the Department closed the referral as "unfounded" because "there was no evidence . . . that [B.P] ha[d] been abused . . . ." Nevertheless, it now considered the placement "high risk."

C. *The Dependency as to A.P.*

Meanwhile, in May 2014, the mother gave birth to A.P. A.P., too, tested positive for methamphetamine. The Department detained A.P. and filed an "add sibling" petition regarding her. (Capitalization altered.)

Once again, both parents wanted A.P. placed with the grandmother. Because the April 2014 referral was still under investigation, however, A.P. was placed in foster care with a Ms. S.

In July 2014, at a jurisdictional/dispositional hearing, the juvenile court found that it had jurisdiction over B.P. It denied reunification services and set a section 366.26 hearing.

As of August 2014, the grandmother's "adult son" (apparently referring to G.P.) was living in the home. However, the drug charge against him had been dropped.

In August 2014, the grandmother started having visitation with A.P. Initially, she visited for two hours a week, but by November 2014, she had worked her way up to one overnight visit a week, on weekends. In October 2014, she was approved as a placement for A.P. However, the placement could not be made immediately, because she worked full-time and B.P.'s daycare did not have room for A.P. In December 2014, her daycare application for A.P. lapsed and she had to submit a new one. By this point, her visitation with A.P. had become "inconsisten[t]."

5

Meanwhile, in October 2014, at a section 366.26 hearing, the juvenile court terminated parental rights to B.P. The grandmother was to be given preferential consideration for adoption.

D.  *The March 2015 Referral.*

In March 2015, the Department received a referral alleging that the grandmother was allowing the mother and the father to stay in the home. It was also reported that she allowed "[a]ll kinds of family members to come and go from the home and these individuals are known to be illegal substance users . . . ."

In response, a social worker visited the home, where he found the father, the mother, and J.P. J.P. admitted that he was living there. At first, the father also admitted that he was living there; however, after the social worker identified himself, the father "recanted his statement." The father pointed out that B.P. was at daycare.

The grandmother admitted that J.P. had been living with her for two weeks and that she had not notified the Department. She claimed that the mother and father were living in an abandoned house next door; J.P. would let them into her house when she was not there to eat or to shower. She also claimed that "she could not control her son accessing her home."

The Department "determined that [the grandmother] is not an appropriate candidate for [a]doption and would not receive an approved homestudy." As a result, in April 2015, it filed a notice of intent to remove B.P. from his placement with the grandmother. It also required that the grandmother's visitation with A.P. be supervised.

The grandmother filed an objection to removal, in which she stated: "I don't believe that my grandson faces any safety risk, being that he is in a full time day care while I am working and is only supervised by cleared adults [at] my home when necessary. I am in the process of obtaining custody of [A.P.] and would like to continue to try to keep my two grandkids together. I will do what the court requires and advises in order to keep my two grandkids."

At a hearing on April 15, 2015, the juvenile court ordered B.P. removed from the grandmother's home. It also revoked her designation as the prospective adoptive parent.

E.       *The Competing Claims of the Grandmother, the S.'s, and Others*

B.P. was placed in foster care with Ms. S., with whom A.P. was already placed. However, the Department understood that Ms. S. was "unable to commit to the adoption of both children." Accordingly, on May 1, 2015, it removed the children from Ms. S. and placed them in another prospective adoptive home.

A flurry of section 388 petitions and de facto parent requests ensued.[1]

On May 1, 2015, the grandmother filed a section 388 petition, seeking to have both children placed with her. On May 5, 2015, she filed a de facto parent request as to both children.

---

[1]       When a given party filed two separate section 388 petitions or de facto parent requests, one as to B.P. and one as to A.P., we will refer to those collectively as a single petition or a single request.

On May 7, 2015, the S.'s filed a section 388 petition, seeking placement of both children. They claimed that they were willing to adopt both children, but the Department had removed the children without giving them either enough time or enough information to proceed. They also filed a de facto parent request, solely as to A.P.

At the same time, the paternal grandfather and the grandmother's boyfriend also filed section 388 petitions and de facto parent requests.

On May 19, 2015, the juvenile court denied the grandmother's section 388 petition and de facto parent request without a hearing.[2] It likewise denied the petitions and requests by the paternal grandfather and the grandmother's boyfriend. However, it set a hearing on the S.'s petition and request. Subsequently, it granted the S.'s de facto parent request.

The Department opposed the S.'s section 388 petition; it recommended that the children remain with the then-current prospective adoptive parents. Nevertheless, the juvenile court granted their petition and placed both children back with the S.'s.

---

[2] The grandmother filed her original section 388 petition and de facto parent request in propria persona. After those were denied, she retained counsel and filed a new section 388 petition and a new de facto parent request through counsel. The record does not reflect any ruling on the latter petition and request, and the grandmother does not raise any claim of error regarding them.

II

THE DENIAL OF THE GRANDMOTHER'S SECTION 388 PETITION

The grandmother contends that the trial court erred by denying her section 388 petition without a hearing.

A. *The Allegations of the Petition*.

The grandmother's section 388 petition asked the juvenile court to place both children with her for adoption.

As changed circumstances, she alleged, "I have made new living arrangements . . . ." "I am now in the process of obtaining restraining orders against [the] biological parents and willing to relocate if necessary."

She alleged that the proposed order would be in the best interest of the children because they "would remain with their biological parent[']s family" and would be "with their family that they have bonded with since birth."

B. *Discussion*.

"A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new evidence or changed circumstances exist and (2) the proposed change would promote the best interests of the child. [Citation.] The parent bears the burden to show both a legitimate change of circumstances and that undoing the prior order would be in the best interest of the child. [Citation.] Generally, the petitioner must show by a preponderance of the

evidence that the child's welfare requires the modification sought. [Citation.]" (*In re A.A.* (2012) 203 Cal.App.4th 597, 611-612.)

"Under section 388, a party 'need only make a prima facie showing to trigger the right to proceed by way of a full hearing.' [Citation.] The prima facie showing is not met unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition. [Citation.] In determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case. [Citation.]" (*In re J.P.* (2014) 229 Cal.App.4th 108, 127.)

"'The petition is addressed to the sound discretion of the juvenile court, and its decision will not be overturned on appeal in the absence of a clear abuse of discretion.' [Citation.]" (*In re J.T.* (2014) 228 Cal.App.4th 953, 965.) "'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' [Citation.]" (*In re Stephanie M*. (1994) 7 Cal.4th 295, 318-319, original quotation marks corrected.) "'The denial of a section 388 motion rarely merits reversal as an abuse of discretion.' [Citation.]" (*In re Daniel C*. (2006) 141 Cal.App.4th 1438, 1445.)

The juvenile court denied the petition because "[t]he request does not state new evidence or a change of circumstances." This was not an abuse of discretion. The grandmother said she had made new living arrangements but did not say what they were. She said she was in the process of obtaining restraining orders against the parents but did

not say she had actually obtained them. (It was not clear that she would even be able to serve the parents. At times, the Department had been unable to locate them for purposes of service.) And she said nothing about whether J.P., A.P., and G.P. would be living with her or visiting her. The problem was that she allowed her adult children, who had drug-related criminal records, to have access to her home; merely relocating would not change this.

There were also serious issues as to whether the grandmother could be trusted. She had signed a declaration stating — falsely — that J.P. was not living with her. She had been told that no one else could live in or have regular contact with her home without permission. She had also been told not to let the father have any contact with the child. Nevertheless, J.P. and the father admitted that they were living with her. In light of this history, the juvenile court could rightfully conclude that she could not assure it that any changes that she made would stick.

Finally, the Department had decided that the grandmother was "not an appropriate candidate for [a]doption and would not receive an approved homestudy." The record does not expressly state the reason for this decision. Thus, it is not clear that, even if the grandmother took firm action to exclude her adult children from her home, the Department would change its mind. For example, the Department may have decided that the grandmother was no longer entitled to a criminal records exemption because, in light of her false statements, there was no longer "substantial and convincing evidence to support a reasonable belief that [she] is of such good character as to justify the placement

11

. . . ." (Welf. & Inst. Code, § 361.4, subd. (d)(2).) We could not say that this was an abuse of discretion. (See generally *In re Esperanza C*. (2008) 165 Cal.App.4th 1042, 1050.) Hence, the grandmother failed to make a prima facie showing of a material change of circumstances.

We therefore conclude that the juvenile court properly denied the grandmother's section 388 petition without a hearing.

III

DE FACTO PARENT REQUEST

The grandmother contends that the trial court erred by denying her de facto parent request without a hearing.

A.    *Additional Factual and Procedural Background*.

In her de facto parent request, with regard to B.P., the grandmother stated that she had lived with him and cared for him on a day-to-day basis from October 2013 through April 2015. She added, "I spent my days off work with my grandson, and all weekends. I spent all evenings preparing him for school the next day." "I consider [B.P.] my son, therefore I treated him as so, read books, played, took him to many parks, Disneyland, Universal Studios, zoo and family trips. I taught him to dance." "I have [B.P.'s] medical records, educational rights, and . . . I took him to all medical appointments. I have birth records as well." She noted that she had attended court hearings in his case.

With regard to A.P., the grandmother stated that she had lived with her and cared for her on a day-to-day basis from August 2014 through April 2015.[3] In the space for indicating how much time she spent with the child, she stated, "[O]vernight weekend visits unsupervised." In the space for activities she did with the child, she stated: "All activities such as bathe, feed, nurture and care for. I also took her to family outings, gatherings and trips." "I have birth records and immunization records as well." Again, she noted that she had attended court hearings in A.P.'s case.

B.      *Discussion.*

1.      *General legal principles.*

"A de facto parent is 'a person who has been found by the court to have assumed, on a day-to-day basis, the role of a parent, fulfilling the child's physical and psychological needs for care and affection, and who has assumed that role for a substantial period.' [Citations.] De facto parent status gives the child's present or previous caretaker standing to participate as a party in disposition hearings and subsequent hearings in which the status of the dependent child is at issue. [Citation.] A de facto parent has the right to be present at the hearing, be represented by retained counsel, and present evidence. [Citation.] The purpose of conferring de facto parent

---

[3]      As the Department points out, this was not true; the grandmother had never actually lived with A.P. However, she also stated that the time she spent with A.P. consisted of unsupervised weekend overnight visits. Thus, her request as a whole was not misleading; and even if it were, it does not appear that the juvenile court was actually misled.

13

status is to 'ensure that all legitimate views, evidence and interests are considered in dispositional proceedings involving a dependent minor.' [Citation.]" (*In re Merrick V.* (2004) 122 Cal.App.4th 235, 256, fn. omitted.)

"Relevant factors the court should consider in determining whether to grant a de facto parent request include whether the child is psychologically bonded to the adult, whether the adult has assumed the role of a parent on a day-to-day basis for a substantial period, whether the adult possesses information about the child that other participants do not possess, whether the adult has regularly attended juvenile court hearings, and whether a future proceeding may result in an order permanently foreclosing any future contact with the adult. [Citations.]" (*In re A.F.* (2014) 227 Cal.App.4th 692, 699-700.)

"'Because a court can only benefit from having all relevant information, a court should liberally grant de facto parent status.' [Citation.]" (*In re Giovanni F.* (2010) 184 Cal.App.4th 594, 602.)

If the request fails to make a prima facie showing, the trial court need not even hold a hearing. (*In re R.J.* (2008) 164 Cal.App.4th 219, 224-225.) "A party has not made a prima facie showing unless the facts alleged, if supported by evidence credited at the hearing, would sustain a favorable decision on the request. [Citation.] Whether the showing is sufficient to require an evidentiary hearing is a matter committed to the broad discretion of the juvenile court, whose decision may be overturned only if it amounts to a manifest abuse of that discretion. [Citation.]" (*Id.* at p. 224, fns. omitted.)

14

## 2.     *The de facto parent request as to B.P.*

Here, the grandmother had acted as B.P.'s parent for a year and a half, from when he was six months old until he was two.  He had bonded with her.  She would have information about him that no social worker, visiting only occasionally, and no other participant in the proceeding could have.  She had regularly attended hearings in the case.  Finally — and particularly because, as we held in part II, *ante*, the juvenile court properly denied her section 388 petition — she was facing the likelihood that B.P. would be adopted by a non-family member, which would cut off her contact with him.

In sum, then, the factors that we identified in *In re A.F.*, *supra*, weighed in favor of the grandmother.  Indeed, the Department does not argue otherwise.  Instead, it argues: "[B.P.] was removed from the grandmother's home . . . because her home was unsuitable. [Citations.]  [The grandmother] acted contrary to the role of a parent, which is a basis to deny her request for de facto parent status.  [Citation.]"

In *In re Kieshia E.* (1993) 6 Cal.4th 68, the Supreme Court held that "a child abuser [can n]ever intervene as the victim's de facto parent in proceedings which arose from the abuse." (*Id*. at p. 74.)  There, the reason for the dependency was that the mother's live-in boyfriend had molested one of the mother's children.  (*Id*. at pp. 71-72.)  That same boyfriend then applied for de facto parent status.  (*Id*. at pp. 73-74.)  The court declared:  "[A] nonparent who commits sexual or other serious physical abuse upon a child in his or her charge thereby abandons the function of care, affection, and psychological fulfillment essential to the role of a de facto parent.  When a juvenile court

15

has found that the nonparent committed such abuse, and has therefore deemed it necessary to make the victim a dependent of the court, the abuser is barred from intervening in the same proceeding under the de facto parenthood doctrine." (*Id.* at pp. 79-80; see also *In re Merrick V.*, *supra*, 122 Cal.App.4th at pp. 256-258 [grandmother not entitled to de facto parent status where she indirectly caused dependency by leaving the children with their drug-using mother]; *In re Leticia S.* (2001) 92 Cal.App.4th 378, 382-383 [mother's boyfriend not entitled to de facto parent status where he caused dependency by using drugs with mother, leaving drugs and paraphernalia in children's reach, and hitting child with shoe].)

The principles of *Kieshia E.* have been extended to cases in which the applicant's misconduct was not the root cause of the dependency. For example, in *In re Jacob E.* (2004) 121 Cal.App.4th 909, the child (Jacob) was declared a dependent because the mother was abusing methamphetamine. (*Id.* at p. 914.) He was placed with the maternal grandmother (Anna) (*ibid.*), but three years later, he was removed. (*Id.* at p. 915.) The court held that the grandmother's de facto parent application was properly denied. (*Id.* at pp. 919-921.) It explained: "While Jacob lived with Anna for a long period of time, she did not show that she adequately assumed the role of parent on a day-to-day basis, fulfilling his physical and psychological needs. Rather, though the record shows that Jacob and Anna had a close and loving relationship, it also shows that Anna neglected parental responsibilities, chief among them her failure to enroll Jacob in kindergarten, to schedule medical and dental appointments, and to ensure that Jacob maintain a

16

relationship with his disabled older brother. After repeated attempts to get Anna to comply with juvenile court orders and work with the Department, the Department and Jacob's attorney concluded it had no option but to find a more suitable placement for Jacob. After Jacob was removed from Anna's care, he revealed she would hit him with a stick, and that he had witnessed domestic violence. Under these circumstances, Anna acted contrary to the role of a parent." (*Id*. at p. 920; see also *In re Michael R*. (1998) 67 Cal.App.4th 150, 156-158 [grandmother not entitled to de facto parent status where she allowed physically abusive father to have unauthorized visitation with children and, when discovered, she abducted children and fled the state].)

Nevertheless, "'[a] person will not necessarily lose the status of de facto parent merely because the child has been removed from his or her custody.' [Citation.]" (*In re Robin N*. (1992) 7 Cal.App.4th 1140, 1145.)

*In re Bryan D*. (2011) 199 Cal.App.4th 127 held that an applicant can qualify as a de facto parent, despite misconduct requiring removal, where the misconduct does not rise to the level of sexual or serious physical abuse. The child, aged 12, lived with his grandmother; he was declared a dependent because she left him home alone three times — once for three days, once for about 10 days, and once for about 12 days. (*Id*. at pp. 131-132, 134.) The trial court denied her request for de facto parent status (*id*. at p. 137), but the appellate court held that this was an abuse of discretion. (*Id*. at pp. 144-147.)

17

The court explained: "[I]n our view, *Kieshia E.* does not stand for the proposition that any time the conduct of a person who would otherwise qualify as a de facto parent directly or indirectly causes the initiation of dependency proceedings, that person is automatically ineligible for de facto parent status, regardless of the nature of the conduct. *Kieshia E.* explicitly focused on 'sexual or other serious physical abuse' that led to dependency proceedings. Subsequent cases have extended *Kieshia E.*'s analysis to conduct other than sexual or physical abuse, but these cases still concern serious and substantial harms to the children involved." (*In re Bryan D.*, *supra*, 199 Cal.App.4th at p. 143.)

"[W]e cannot say that grandmother is entirely blameless. Her conduct was a cause of the dependency proceedings. But, under *Kieshia E.*, there must be evidence that the 'nonparental caretaker committed a substantial harm, such as sexual or other serious physical abuse, which is fundamentally at odds with "the role of parent" . . . .' [Citation.] There was no evidence grandmother subjected Bryan to sexual or physical abuse. Grandmother's failure to make more appropriate short-term childcare arrangements for Bryan was not an abandonment or betrayal of the role of parent in the way sexually or physically abusing a child is a complete rejection of the role of parent. [Citation.] Grandmother demonstrated poor judgment that placed Bryan at risk of harm, but her failures were not fundamentally at odds with the role of parent . . . ." (*In re Bryan D.*, *supra*, 199 Cal.App.4th at p. 146.)

18

"We also note that a de facto parent is 'not considered a parent or guardian for purposes of the dependency law. [Citations.] Therefore, the de facto parent is not entitled to all of the rights accorded to persons who occupy the status of parent or guardian.' [Citations.] A de facto parent is not entitled, as a matter of right, to custody of the child, reunification services, or visitation. [Citations.] De facto parent status merely allows a person who has assumed the role of parent of a child to participate in the court hearings and share their 'legitimate interests and perspectives' with the juvenile court as it makes decisions about the child's future care and welfare. [Citation.] Granting de facto parent status does not mean the child will be placed with the de facto parents. The status merely provides a way for the de facto parent to stay involved in the dependency process and provide information to the court." (*In re Bryan D.*, *supra*, 199 Cal.App.4th at p. 146.)

Here, as in *Bryan D.*, the grandmother's misconduct, while sufficient to support removal, was not substantial sexual or physical abuse and not fundamentally at odds with the role of parent. She allowed the father and J.P. in the house. However, there is no evidence that they used, possessed, or were under the influence of drugs at that time. There is also no evidence that they were ever left alone with B.P. A fortiori, there is no evidence that B.P was harmed or placed in harm's way as a result. The Department closed the April 2014 referral as unfounded because "there was no evidence . . . that [B.P] ha[d] been abused . . . ." Likewise, it closed the March 2015 referral because B.P. "was found not to be abused . . . ."

We therefore conclude that the grandmother made a prima facie case that she was entitled to de facto parent status. Accordingly, the juvenile court erred by denying her request without a hearing. It does not follow, however, that it was required to grant her request. One court has suggested (in dictum) that a request can be denied without a hearing, even if it does make a prima facie case. (*In re R.J.*, *supra*, 164 Cal.App.4th at pp. 223-224.) Even if so, there must be some good cause for the denial; no good cause appears here. Moreover, surely a request cannot be *granted* without a hearing — or, at least, without giving other parties the opportunity to be heard in writing, if not orally. Here, the Department and B.P. have never had the opportunity to be heard or to introduce evidence in opposition to the request.

We also note that, even assuming the grandmother was entitled to de facto parent status when she filed her request, it does not follow that she is still entitled to it. She could have sought speedier relief by filing a petition for an extraordinary writ or for a writ of supersedeas, but she did not. And things can change in a year — especially a year in a toddler's life. The grandmother may no longer play the role of psychological parent in B.P.'s life. This is another reason to require the juvenile court to hold a further hearing.

Accordingly, we will reverse the juvenile court's order and remand with directions to reconsider the grandmother's request for de facto parent status as to B.P.; such reconsideration shall include allowing all parties to present evidence and argument as well as holding a hearing.

20

### 3. *The de facto parent request as to A.P.*

The grandmother's relationship with A.P. was significantly different from her relationship with B.P. She had never lived with A.P. She had had visitation with A.P. from August 2014 through April 2015; from at least November 2014, this consisted of one overnight visit a week. However, her visitation had become inconsistent; she missed some visits, and she ended others early. After B.P. was removed from her home, she was offered supervised visitation with A.P., but it appears that she did not take advantage of it.

Thus, there was no showing that A.P. was psychologically bonded to the grandmother or that the grandmother had assumed the role of A.P.'s parent on a day-to-day basis for any substantial period. She was more like a babysitter. It did not appear that she would have anything to contribute to the proceedings regarding A.P. that the S.'s could not.

The trial court therefore properly denied the grandmother's de facto parent request as to A.P.

## IV

## DISPOSITION

The order denying the grandmother's section 388 petition is affirmed. The order denying the grandmother's de facto parent request as to A.P. is also affirmed. The order denying the grandmother's de facto parent request as to B.P. is reversed. On remand, the juvenile court shall reconsider the grandmother's request for de facto parent status as to

21

B.P.; such reconsideration shall include allowing all parties to present evidence and argument as well as holding a hearing.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

HOLLENHORST
J.

McKINSTER
J.

22