Filed 2/19/14  In re A.K. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.K. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E058309 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ116828) |
| v. | OPINION |
| L.R. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Jacqueline C. Jackson, Judge.  Affirmed.

Julie E. Braden, under appointment by the Court of Appeal, for Defendants and Appellants.

Pamela J. Walls, County Counsel, and Julie Koons Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

1

I

INTRODUCTION[1]

The subjects of this appeal are two children, A.K., born in 2004, and C.S., born in 2007.  L.R., their maternal grandmother (MGM), and her boyfriend, M.P., appeal from an order denying a hearing on their request for de facto parent status.  (Cal. Rules of Court, rule 5.502(10); § 395.)

The present dependency case was preceded by an earlier referral in 2004 and a separate dependency case between 2008 and 2010.  This second dependency case began in August 2012.  We affirm the trial court's order.

II

FACTUAL AND PROCEDURAL BACKGROUND

A.  *Prior Child Welfare History*

In December 2004, DPSS[2] received a complaint that mother had left A.K., an infant, with L.R. and that adults in the household were using methamphetamine and marijuana.  No investigation was completed.  After mother was arrested in March 2008 for child endangerment, the charges were dropped.

B.  *2008 Detention*

DPSS filed the first original dependency petition in August 2008.  The petition alleged the parents had failed to protect and support the children and had neglected them

_____

[1]  All statutory references are to the Welfare and Institutions Code unless stated otherwise.

[2]  Department of Public Social Services, County of Riverside.

by leaving them with L.R. who had an "extensive CPS History" and was on probation after being arrested in January 2008 for possession of marijuana for sale and possession of paraphernalia. (Health & Saf. Code, §§ 11359, 11364.)

L.R. told DPSS that mother was homeless and often left the children with her. Their fathers had little contact with them and the fathers' whereabouts were unknown. L.R.'s boyfriend for eight years was M.P. After their arrest for possession of marijuana for sale, L.R. and M.P. were on a weekend work release program. They were unemployed and were living on money from M.P.'s 401K account. L.R. had used both marijuana and methamphetamine in the past. She admitted that her parental rights to her own three children, including mother, had been terminated in 1999 based on methamphetamine use and other neglect.

The criminal record for L.R. extended from August 1999 until January 2008 and involved 10 offenses, including five that were drug-related. DPSS recommended that L.R. have supervised visitation with the children who were placed in foster care.

On July 24, 2008, the probate court ordered L.R. to have temporary legal guardianship of the children. L.R. sought guardianship to provide the children with a stable environment as opposed to living on the streets with their mother. On July 30, 2008, L.R. told DPSS that mother had left L.R.'s home after being advised of the guardianship hearing scheduled for August 14, 2008. L.R. had provided primary care for the children between May and August 2008. Both children had been in and out of her care since birth. On August 4, 2008, the juvenile court ordered the children removed.

3

*C. 2008-2010 Jurisdiction/Disposition*

In an interview with DPSS, mother explained that she had left the children with the MGM because she had no housing and nowhere to go. Mother who was born in 1987, recounted that, after her parents separated, L.R. had a relationship for five or six years with a man who beat mother and her brothers. L.R. had used drugs until her partner was incarcerated. L.R. then moved in with another man who abused her. Mother said L.R. and her partner were using drugs and he made sexual remarks to mother when she was 16 and 18. After DPSS removed mother, she lived with her paternal grandmother and great-grandmother. When mother was a pregnant minor, she married A.K.'s father after L.R. gave her consent. A.K.'s father was abusive and the marriage was soon annulled. Mother reported using marijuana at 13, methamphetamine at 14, heroin at 20 when she overdosed, and marijuana in 2008.

C.S.'s father reported that mother had lived with his family from December 2006 until he was incarcerated in March 2008. He had a close family life, without violence or abuse, and frequent church participation. C.S.'s father had started using methamphetamine at age 16. He had sustained a driving under the influence charge about 10 years ago. In March 2008, he was convicted of child endangerment after his daughter from another relationship was found in the presence of drugs and paraphernalia.

In September 2008, mother and C.S.'s father began living in Tulare County and participating in services there although they could not conduct visitation from that distance. Mother believed her children were well cared for by L.R. and M.P. who were

4

visiting the children weekly with supervision. The social worker reported the grandmother's home was determined inappropriate for the children.

On September 22, 2008, the juvenile court sustained the amended petition, declared dependency, removed custody, denied services to A.K.'s father, and ordered services for mother and C.S.'s father. The court transferred the case to Tulare County.

In October 2008, L.R. filed a request for de facto parent status, stating that she had cared for A.K. from February 2005 until July 2008 and C.S. from February 2008 until July 2008. The juvenile court denied the request without prejudice due to the transfer to Tulare County.

In September 2009, the children were returned to mother with family maintenance services. The parents were stable and sober, and had married. In July 2010, the dependency was terminated.

*D. 2012 Detention*

DPSS filed a second original dependency petition in November 2012. It alleged the parents' failure to protect and support, primarily because of mother's substance abuse, mental health issues, and incarceration. DPSS had received a referral in October 2012 after the mother had seemed erratic and under the influence when she was late picking up C.S. from school. On October 4, 2012, she kept C.S. at home because she knew DPSS had been called.

L.R. reported mother had left the children with her for months at a time. A.K. was living with L.R. Mother had left L.R.'s home, taking C.S. with her, after failing to follow the house rules. Mother and C.S. were not living with L.R. and she did not know the

5

mother's whereabouts. L.R. asserted that she and M.P. had completed their probation and were not engaged in drug use or crime. The home was clean and safe and A.K. was cared for well.

A.K. said mother had been living with C.S.'s father. A.K. had observed domestic violence between her mother and C.S.'s father and C.S.'s father smoked "green stuff with paper." A.K. liked living with L.R. although she preferred to live with her mother. She denied any alcohol, drugs, or domestic violence in L.R.'s home. A.K. appeared safe and healthy.

Mother explained she had returned to L.R.'s home in August 2012, after C.S.'s father threw a vacuum cleaner at her, hit her, and spanked the children. She took C.S. with her when L.R. told her to leave. Mother was homeless and using methamphetamine. She blamed the domestic violence for her relapse. Mother was arrested for vehicle theft, for possession of stolen property, and for being under the influence of methamphetamine. C.S., who was very dirty, was found in a one-bedroom apartment where a hypodermic needle was in his reach and seven adults were under the influence of drugs or were known drug users.

A.K. confirmed C.S.'s father hit the mother as well as herself and her brother. In another interview, A.K. said she lived with L.R. because her mother left the home with C.S. She denied knowing about drug use but she suspected C.S.'s father was using marijuana. She confirmed that C.S.'s father hurled a vacuum at the mother and injured her. He barricaded the door if the police were called. He spanked the children with belts or slippers that did not leave bruises. A.K. wished to return to L.R.'s care.

6

C.S. said his father would get mad and hit mother and the children. His father fought and threw things like the air conditioner at mother.

L.R. had asked to keep C.S. in her home when the mother left taking C.S. with her. L.R. asked to be considered for placement, or, in the alternative, M.P.'s sister and her husband. L.R.'s home was neat and clean and appropriately furnished with plenty of food. L.R. had chaperoned A.K.'s school trip the previous day.

The juvenile court detained the children and ordered L.R. and M.P. to be assessed for placement. In December 2012, mother was taken into custody on multiple theft charges.

In December 2012, DPSS reported about ongoing conflicts between the foster family and L.R. and M.P. The foster mother wanted to minimize contact between the children, mother, and L.R. DPSS continued to recommend the children stay in foster placement and to conclude that L.R.'s home was inappropriate because of her criminal record and child welfare history.

In January 2013, mother reported L.R. had asked her to leave the home again. The mother had moved back to Tulare County to live in a house owned by her husband although they were separated. C.S.'s paternal grandmother wanted to be considered for placement. The social worker reported mother and the maternal grandparents had been visiting together and the maternal grandparents interacted more with the children.

On January 22, 2013, the juvenile court sustained the modified dependency petition, declared dependency, removed custody, and ordered reunification services for the mother and C.S.'s father.

*E.  De Facto Parent Application*

On February 15, 2013, L.R. and M.P. jointly filed requests for de facto parent status as to both children.  In support of their requests, they asserted the children have lived with them intermittently most of their lives, beginning in infancy.  Appellants participate in family and school activities with the children.  Appellants described the children's particular medical problems and the trauma they experienced from mother and C.S.'s father.  The juvenile court summarily denied the request without a hearing.

III

DE FACTO PARENT REQUEST

A de facto parent is "a person who has been found by the court to have assumed, on a day-to-day basis, the role of parent, fulfilling both the child's physical and psychological needs for care and affection, and who has assumed that role for a substantial period."  (Cal. Rules of Court, rule 5.502(a)(10).)  "The purpose of conferring de facto parent status is to 'ensure that all legitimate views, evidence and interests are considered in dispositional proceedings involving a dependent minor.'  [Citation.]"  (*In re Merrick V.* (2004) 122 Cal.App.4th 235, 256.)

The denial of a petition for de facto parent status is reviewed for abuse of discretion.  (*In re Leticia S.* (2001) 92 Cal.App.4th 378, 381; *In re Jacob E.* (2004) 121 Cal.App.4th 909, 919.)  The party seeking de facto parent status has the burden of proving, by a preponderance of the evidence, that he or she falls within the statutory definition.  (*Jacob E.,* at p. 919.)  De facto parent status includes these factors:  "(1) whether the minor is psychologically bonded to the adult; (2) whether the adult has

8

assumed the role of a parent on a day-to-day basis for a substantial period of time; (3) whether the adult possesses information about the minor unique from other participants in the process; (4) whether the adult has regularly attended juvenile court hearings; and (5) whether any proceeding may result in an order permanently foreclosing any future contact between the adult and the child." (*In re R.J.* (2008) 164 Cal.App.4th 219, 223; *Jacob E.,* at p. 919; Cal. Rules of Court, rule 5.502(10).)

Appellants argue they made a prima facie showing that the juvenile court was likely to make a favorable decision on their request for de facto parent status. Appellants claim that, in applying the relevant criteria, the juvenile court abused its discretion when it denied appellants an evidentiary hearing. (*In re R.J., supra,* 164 Cal.App.4th at pp. 223-224.) The latter case specifically held that no authority exists "for the proposition that a party requesting de facto parent status is entitled to a hearing upon making a 'prima facie showing.'" (*Ibid.*) Furthermore, even assuming that a party requesting de facto parent status is entitled to an evidentiary hearing upon making a prima facie showing, appellants failed to make such a showing here.

An applicant may be precluded from de facto parent status if his or her misconduct led to the dependency. (*In re Kieshia E.* (1993) 6 Cal.4th 68, 78-79; *In re Leticia S., supra*, 92 Cal.App.4th at pp. 382-383.) Here L.R.'s parental rights to her own children were terminated in 1999. L.R. was the subject of a dependency referral involving A.K. in 2004, the year she was born. In August 2008, L.R.'s criminal record and dependency history made her unsuitable to have placement of the children.

9

Furthermore, the children were mostly out of L.R. and M.P.'s care since August 2008. L.R claimed they had custody of A.K. between June and August 2009 and both children from October 2010 to January 2011 and from August 2012 until November 2012. But even if L.R. and M.P. had the children intermittently, they only cared for them for 11 months between August 2008 and November 2012, more than four years.

Appellants cannot satisfy most of the five factors to be considered in assessing an application for de facto parent status. (*In re R.J., supra*, 164 Cal.App.4th at p. 223.) Although the children may have a psychological bond to appellants, L.R. and M.P. did not assume parental roles for a substantial period of time and they did not offer any unique information about the children. As to the fifth consideration, it is speculation at this point in the dependency proceedings to say that parental rights will be terminated.

Appellants rely heavily on *In re Bryan D.* (2011) 199 Cal.App.4th 127, a case significantly different from this one. The child in *Bryan D.* was 12 years old and had lived with his grandmother his whole life. The court noted the grandmother's conduct was not equivalent to "sexual or other serious physical abuse" but constituted only inadequate childcare arrangements. (*Id.,* at p. 144.) The Court held the grandmother's conduct was "not fundamentally at odds with the role of parent" and therefore the juvenile court abused its discretion in denying de facto status because the decision was unsupported by substantial evidence. (*Id.* at pp. 146-147.) The court stated that, in the absence of evidence of serious abuse or risk, the juvenile court should liberally grant de facto parent status to the qualifying applicant. (*Id.* at p. 147.)

Here L.R. had a history of inadequate parenting from 1999 to 2008. Actually, L.R.'s parenting failures began long before 1999 during mother's early childhood. Although the children lived with her intermittently until July 2008, she was arrested on drug charges in January 2008. Between August 2008 and November 2012, more than four years, the children lived with L.R. and M.P. for only 11 months. In spite of appellants' assertion, the record contradicts that they "provided housing, schooling, medical care, and guidance to both youngsters for large portions of their lives." Based on the record, there is no substantial evidence that the juvenile court abused its discretion when it entered a summary denial of appellants' application for de facto parent status. (*In re Bryan D., supra*, 199 Cal.App.4th at pp. 146-147.)

IV

DISPOSITION

We affirm the denial of a hearing on the appellants' request for de facto parent status.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

HOLLENHORST
Acting P. J.

McKINSTER
J.

11