Filed 3/2/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re JUSTIN O. et al., Persons Coming Under the Juvenile Court Law. | B287406<br>(Los Angeles County<br>Super. Ct. No. CK74972) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>V.M.,<br><br>　　　Defendant and Appellant. | |

　　　APPEAL from orders of the Superior Court of Los Angeles County, Emma Castro, Commissioner and Sherri Sobel, Juvenile Court Referee.  Reversed.

Michelle L. Jarvis, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kristine P. Miles, Assistant County Counsel, and Peter Ferrera, Principal Deputy County Counsel, for Plaintiff and Respondent.

———————————

Dependency proceedings commenced in October 2008 with Shane (also referred to in the record as Shawn), mother's oldest child. In 2011, maternal grandmother (Grandmother) adopted Shane. Grandmother also had custody of mother's younger children David, Justin, and Liam, the subjects of the current appeal.

In July 2017, the Los Angeles County Department of Children and Family Services (DCFS) accused Grandmother of physically abusing then four-year-old Justin and filed a supplemental Welfare and Institutions Code[1] section 387 petition. Evidence from a forensic examination was inconclusive; the nurse examiner was unable either to rule out accidental trauma or to conclude Grandmother physically abused Justin.

The juvenile court denied Grandmother de facto parent status notwithstanding the undisputed facts that mother's four children lived with her, and that Grandmother cared for them as a parent for an extended period of time. The juvenile court then refused to permit Grandmother to defend herself against the allegations of physical abuse. Her counsel was not permitted to admit evidence or argue on her behalf. Without hearing from

---

[1] Undesignated statutory citations are to the Welfare and Institutions Code.

2

Grandmother or her counsel, the juvenile court sustained the allegation of physical abuse, and DCFS removed David, Justin, and Liam from Grandmother's care.

On appeal Grandmother challenges the juvenile court's denial of her requests for de facto parent status, made prior to the sustained findings of abuse. Grandmother also challenges the order sustaining the section 387 petition.

We conclude that the juvenile court erred in denying Grandmother de facto parent status. The court then compounded the error by refusing to allow Grandmother an opportunity to present evidence or argument at the purported "hearing" on the section 387 petition. We reject respondent's argument that the appeal is moot. A decision in this appeal may affect Grandmother's visitation with the Children, as well as her ability effectively to parent her adopted son, Shane, who remains in her custody. We reverse the juvenile court's order sustaining the section 387 petition.

## BACKGROUND[2]

Grandmother, V.M., was a licensed foster parent from 1993 to 2011. Grandmother provided a foster home for mother beginning when mother was seven years old, and Grandmother subsequently adopted mother. At the time mother began living with Grandmother, mother suffered from attention deficit disorder, attention deficit hyperactivity disorder, and bipolar depression. Grandmother taught elementary school for 30 years before retiring.

---

[2] Finding good cause, on our own motion, we take judicial notice of the juvenile court record in Los Angeles Superior Court case Nos. CK74972 and DK23938. (Evid. Code, § 452, subd. (d).)

3

This case concerns three of mother's five children—Justin, David, and Liam (the Children). The juvenile court previously terminated mother's parental rights to her oldest child Shane and, as noted, Grandmother adopted Shane in January 2011. Shane had been living with Grandmother since he was three months old, and Grandmother's adoption home study was completed in December 2009. DCFS reported that Grandmother provided Shane with "a safe, stable, and loving environment."

Justin was born in April 2013. In April 2014, the juvenile court assumed jurisdiction over him. DCFS initially placed Justin with paternal relatives. In August 2015, the juvenile court denied Grandmother's section 388 petition seeking an order placing Justin in her care. Prior to denying Grandmother's petition, the juvenile court allowed Grandmother to testify at a hearing. In October 2015, DCFS reported that no paternal relative was able to care for Justin. That same month, DCFS placed Justin with Grandmother. Grandmother indicated that she was aware of, and willing to care for Justin's motor and speech delays. She expressed an interest in adopting Justin, and DCFS described her as a prospective adoptive parent.

David was born in July 2014, and when he was one month old, DCFS placed him in Grandmother's care. In September 2014, the court assumed jurisdiction over David. In November 2015, DCFS reported that Grandmother was planning to adopt David. In April 2015, DCFS reported that David "remains well cared for in the home of" Grandmother. "David was often smiling and appeared very attached to [Grandmother]. David is a healthy baby and is meeting his developmental milestones." In October 2015, DCFS reported that

Grandmother "has demonstrated that she has the ability to meet all of David's needs, including medical care."

Liam was born in November 2015. In 2016, the juvenile court assumed jurisdiction over Liam. Three days after his birth, DCFS placed him in Grandmother's care.

DCFS described Shane, Justin, David, and Liam as "special needs children." Justin was diagnosed with developmental delay and was a client of the Harbor Regional Center. Mother's youngest child, T., was born during the dependency proceedings. In September 2017, T. lived with her father.

1. ***DCFS files a supplemental petition with allegations solely against Grandmother***

On July 18, 2017, DCFS filed a supplemental petition. Section 387 provides in pertinent part: "An order changing or modifying a previous order by removing a child from the physical custody of a parent, guardian, relative, or friend and directing placement in a foster home, or commitment to a private or county institution, shall be made only after noticed hearing upon a supplemental petition." (§ 387, subd. (a).) At that time, Justin was four years old, David was three years old, and Liam was one year old. DCFS alleged Grandmother physically abused Justin "by striking the child's arms with a ruler, inflicting bruises to the child's arms." (Bold omitted.) DCFS further alleged that Grandmother's physical abuse of Justin placed David and Liam at risk of physical abuse.

The juvenile court ordered Grandmother's visits to be monitored. DCFS removed the Children from Grandmother's home and placed Justin with a paternal cousin, David in the home of his paternal grandparents, and Liam in his father's care.

5

## 2. *Grandmother requests de facto parent status for Justin, David, and Liam*

On September 19, 2017, before the juvenile court adjudicated the supplemental petition, Grandmother requested de facto parent status over Justin and David. She indicated that "[o]ther than when they are attending school, virtually all of the children's waking hours are spent with me." Grandmother later requested de facto parent status over Liam.

The juvenile court (Referee Sherri Sobel) denied Grandmother's de facto parent request for Justin, David, and Liam. The juvenile court stated, "I don't believe that she qualifies for de facto status. I will not grant that de facto status."

## 3. *DCFS reports regarding the supplemental petition*

DCFS reported that Grandmother attended weekly visits at the Children's Institute to address behavior management and skill building. The goal of the weekly sessions was to assist Grandmother in coping with challenges of raising children with special needs. Grandmother had some difficulty " 'manag[ing] the [Children's] intense behaviors.' " A family friend reported that after Justin was placed in Grandmother's home, Grandmother experienced more difficulty because Justin "had more needs and requires more attention." The family friend observed no signs that Grandmother abused the Children.

Justin's paternal relative (who cared for Justin before DCFS placed him in Grandmother's custody), gave a social worker a photograph of Justin with bruises on his back and redness in his anal region. The photograph does not show bruises on Justin's arms.

6

To determine the causes of the bruises on Justin's back, a nurse conducted a forensic examination of Justin at USC Medical Center.  The nurse concluded Justin was a " 'poor historian likely due to young age and hyperactivity.' "  Justin told the nurse that " '[s]he hit me with a ruler right here' " and pointed to his arm.  A social worker concluded that Justin was referring to Grandmother.  The forensic nurse observed redness on Justin's "perianal region" and Justin put his index finger into his rectum.  The nurse further observed:  " 'Multiple non specific bruises at various stages of healing scattered on child's back and all extremities.  Child did not disclose history for bruises, unable to determine the cause at this time.  Some bruises may be caused by accidental injury.  Child was observed to be hyperactive and climbing furniture in the exam room.  However, cannot rule out non-accidental trauma.' "  The nurse also indicated:  "Scabbed abrasion on right knee.  Pattern resembles an injury resulting from skidding on a hard surface.  However, no history was obtained today; cannot determine if mark was caused by trauma from accidental or non-accidental injury."  The nurse provided a medication for Justin's diaper rash.

DCFS interviewed Grandmother, who reported that Justin has a skin disorder called dermatographism and that Justin "falls on his back often, bumps into everything, hits and pinches himself, causing the marks.  [Grandmother] reported that the marks on his back are due to him falling on his scooter, and the scooter falling on him."  Grandmother denied hitting Justin with a ruler, further stating that she did not own a ruler.

DCFS confirmed that Justin had dermatographism, but reported that the condition does not cause him to bruise.  A doctor explained:  "[D]ermatographism is [a skin disorder that

appears] red and looks like hives and correlates with something that was touching or rubbing against the skin. Dermatographism does not have the blue, green, yellow or brown coloring of bruising."

One week after DCFS removed Justin from Grandmother's care, a social worker attempted to interview Justin and reported that he "was difficult to interview due to his young age and [his] trying to play and jump up on the beds." Justin reported that he had "booboos on his back" because his cousin scratched his back. Justin also said that "the doctor punched the booboos on his back." Justin showed the social worker a scab on his arm and the social worker observed no other bruises.

Justin's caregiver (no longer Grandmother) reported using rash cream because Justin had sensitive skin. Caregiver reported that "Justin's behaviors are challenging and that he is hitting his teachers at preschool." Caregiver stated that in September 2017, when Justin was placed in her care, he had no bruises on his back.

### 4.    *Juvenile court proceeding*

On September 25, 2017, Grandmother appeared in juvenile court to contest the allegations in the supplemental petition. Counsel appeared and sought to represent Grandmother. Counsel reported that he represented Grandmother in another case "arising out of the identical facts," but that the two cases were not consolidated.[3] The other case involved mother's oldest child, Shane. Counsel sought de facto

---

[3] The juvenile court had previously denied DCFS's motion to consolidate the two cases. Commissioner Emma Castro denied the motion to consolidate.

status for Grandmother and to be appointed as her counsel in the case involving Justin as well. Minors' counsel opposed granting Grandmother de facto parent status. DCFS "had no problem with [Grandmother's] attorney being heard" but opposed "the de facto motion." Because Grandmother's alleged abuse was the subject of the section 387 hearing, she had "unclean hands" and therefore was not entitled to de facto parent status.

The juvenile court (Referee Sherri Sobel) stated that Grandmother was not entitled to counsel. During the same colloquy, the juvenile court indicated that Grandmother was "entitled to be heard," and could "present[ ] evidence to the court that she did not do any of the things of which she was accused." A few minutes later, the juvenile court told counsel he could argue the case, but the court was "not allowing testimony." Ultimately, the court indicated that counsel would not be appointed and denied Grandmother status as a de facto parent. The juvenile court refused to hear any evidence or argument before it decided whether to sustain the allegations in the supplemental petition.

In piquant language,[4] the court reasoned that because the matter was subject to a general placement order and was "relative to relative," DCFS had discretion to move children from relative to relative and Grandmother had "no standing to argue." The juvenile court observed that it was "pushing the envelope just a bit to allow [counsel] to simply enter a denial on her behalf, which is appealable." The court then invited Grandmother to

---

[4] "Let me tell you the way it works—The way it used to work when people actually went to law school, graduated, came here and knew what they were doing. I'm including you in one of those people who actually went to law school."

appeal to determine whether juvenile courts would " 'have to allow relatives to be heard.' "

The juvenile court sustained the section 387 petition and "declare[d] these children dependents . . . ." The court stated: "Prior placement with the maternal grandmother, [Grandmother], is inappropriate for protection of the Children. There are some serious allegations of physical abuse." The court found by clear and convincing evidence that it was not in the Children's "best interests" to return them to Grandmother's custody. The court ordered Grandmother's visits to be monitored and permitted her only weekly one-hour visits.

## 5.   *Appeal*

Grandmother timely appealed from the orders denying her de facto parent status. Grandmother timely appealed from the order sustaining the section 387 petition.

## 6.   *Grandmother's request to change a court order*

While the current appeal was pending, pursuant to section 388[5], Grandmother requested the juvenile court change its court order sustaining the section 387 petition. As Grandmother emphasized in her request to change a court order, the juvenile court reached a conflicting conclusion in Shane's

---

[5] Section 388, subdivision (a)(1) provides in pertinent part: "Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court."

10

case. In Shane's case, the juvenile court struck the allegation of physical abuse against Grandmother but instead, sustained the following allegation: Grandmother " 'inappropriately supervised a child [Justin] that has special needs and a delicate medical condition that resulted [in] injury to the child. [Grandmother's] inability to provide appropriate attention to the child (Justin) with special needs placed [Shane] at risk of physical harm.' " Although the juvenile court (Judge Anthony A. Trendacosta) assumed jurisdiction over Shane, it allowed him to remain in Grandmother's custody.

Grandmother requested unmonitored visitation of Justin and David. Grandmother argued among other things: "Every professional that *[sic]* interviewed Justin noted that he was hyperactive and either climbing on furniture or running around. Every professional has noted that Justin is not articulate. However, DCFS wants the court to believe that abuse occurred because [of] one statement provided with no context." Grandmother further argued that other circumstances explained the bruises on Justin's body.

The juvenile court (Commissioner Emma Castro) denied Grandmother's request to change a court order. The court noted that with respect to Liam, it terminated jurisdiction and granted physical custody to Liam's father.

## DISCUSSION

For the reasons discussed below, we conclude that the juvenile court erred in denying Grandmother de facto parent status and in denying her a hearing prior to sustaining the

11

allegations in the supplemental petition.[6]  As also discussed below, we reject respondent's argument that Grandmother's appeal is moot.

## A.    The Juvenile Court Erred in Denying Grandmother De Facto Parent Status

"The concept of de facto parent has been judicially created to recognize limited rights in dependency cases for a person who has been found by the juvenile court to have assumed, on a day-to-day basis, the role of a parent, fulfilling the child's physical and psychological needs.  [Citations.]  The decision to grant de facto parent status depends on an assessment of the particular individual and the facts of the case.  [Citation.]  The juvenile court applies the preponderance of the evidence standard in making its factual findings and we review those findings for an abuse of discretion."  (*In re Leticia S.* (2001) 92 Cal.App.4th 378, 381; see *In re Bryan D.* (2011) 199 Cal.App.4th 127, 141 [applying abuse of discretion standard of review to juvenile court's decision denying de facto parent status]; *In re Jacob E.* (2004) 121 Cal.App.4th 909, 920 [same].)

The factors courts generally consider for determining de facto parent status include " 'whether (1) the child is

_____

[6] On appeal, Grandmother also argues that section 387 does not apply to a supplemental petition to move children from one relative to other relatives as opposed to "placement in a foster home, or commitment to a private or county institution."  (§ 387, subd. (a).)  Because we reverse the juvenile court's sustaining of the supplemental petition and order denying Grandmother status as a de facto parent for the reasons set forth in our Discussion, we do not address Grandmother's other arguments challenging those rulings.

"psychologically bonded" to the adult; (2) the adult has assumed the role of a parent on a day-to-day basis for a substantial period of time; (3) the adult possesses information about the child unique from other participants in the process; (4) the adult has regularly attended juvenile court hearings; and (5) a future proceeding may result in an order permanently foreclosing any future contact [between the adult and the child.]' " (*In re Bryan D., supra*, 199 Cal.App.4th at p. 141.) "De facto parent status is ordinarily liberally granted on the theory that a court only benefits from having all relevant information on the best interests of the child." (*Ibid.*)

Here, the juvenile court made no factual findings and abused its discretion in denying Grandmother de facto parent status. In September 2017, when Grandmother requested de facto parent status, she had been involved with juvenile court proceedings for almost a decade, since 2008. Grandmother regularly appeared in court. The juvenile court told Grandmother: "[Y]ou have been in front of me multiple times . . . ."

It is undisputed that Grandmother assumed a parental role over the Children. She demonstrated a strong commitment to them, seeking to adopt both David and Justin (in addition to Shane). Grandmother kept the siblings together and provided a home for all of them. She also attended classes to learn to care for special needs children. It is undisputed that Grandmother cared for the Children's day-to-day needs.

The record further suggests that the Children bonded with Grandmother. Apparently, Justin referred to her as "mom," and she made sure all of David's needs were met. Grandmother also had relevant information such as knowledge that Justin suffered

13

from dermatographism, a condition a doctor later confirmed. Finally, the conclusion that future proceedings could affect Grandmother's contact with the Children was inescapable because that is exactly what occurred: DCFS removed the Children from Grandmother's care.

The undisputed facts all militate in favor of de facto parent status. Respondent identifies *no* facts supporting the denial of de facto parent status. The juvenile court identified *no* factual basis for its conclusion that Grandmother was not entitled to de facto parent status. The juvenile court failed to consider the relevant criteria and identified no factual support for its conclusion that Grandmother did not qualify. In short, it abused its discretion in denying Grandmother de facto parent status. (See *In re Ashley P.* (1998) 62 Cal.App.4th 23, 27–30; *In re Vincent C.* (1997) 53 Cal.App.4th 1347, 1359.)

As previously noted, DCFS argued below (but not on appeal), that Grandmother's "unclean hands" deprived her of de facto parent status at the section 387 hearing, albeit the very subject of that hearing was whether Grandmother had "unclean hands."

"Once there is an adjudication that a child is within the jurisdiction of the juvenile court because a nonparental caretaker committed a substantial harm, such as sexual or other serious physical abuse, which is fundamentally at odds with 'the role of parent,' the perpetrator's 'protectible interest' . . . is extinguished." (*In re Kieshia E.* (1993) 6 Cal.4th 68, 78.) This principle does not apply here because at the time Grandmother requested de facto parent status, there had been no adjudication that she committed physical abuse. (*In re Jonique W.* (1994) 26 Cal.App.4th 685, 696–697.)

14

The fact that DCFS alleged Grandmother committed physical abuse did not warrant excluding Grandmother from participating in a hearing in the section 387 petition. (*In re Jonique W.*, *supra*, 26 Cal.App.4th at p. 697.) The very purpose of that hearing was to determine if Grandmother actually inflicted physical abuse on Justin. (*Ibid.*) We also observe that not even the forensic examiner could determine whether Justin's injuries were accidental or caused by physical abuse by Grandmother, or, according to Justin, his cousin or his doctor. The fact that the juvenile court struck nearly identical allegations of abuse against Grandmother in Shane's case underscores why Grandmother should have been given an opportunity to defend the allegations against her at the section 387 hearing.

## B. The Juvenile Court Failed to Follow Mandatory Procedures to Adjudicate a Section 387 Supplemental Petition

When DCFS files a section 387 supplemental petition, a hearing is mandatory. (Cal. Rules of Court, rule 5.565(b).) California Rules of Court, rule 5.565 provides that at a hearing on a supplemental petition, the juvenile court must make two findings: "(A) The factual allegations are or are not true; and [¶] (B) The allegation that the previous disposition has not been effective is or is not true." (Cal. Rules of Court, rule 5.565(e)(1).)

As our sister court explained: "[I]f the relevant 'parent, guardian, relative or friend' denies the allegations of the supplemental petition, the court must conduct a contested hearing to resolve factual disputes and determine whether the allegations of the petition are true." (*In re Jonique W.*, *supra*, 26 Cal.App.4th at p. 692.) A custodial relative has "standing to

15

contest a supplemental petition in the hearing . . . where the relative's conduct and the removal of the minor(s) from the relative's physical custody are at issue." (*Id*. at p. 693.) A de facto parent has rights in addition to a relative and may "participate as a full party to the contested hearing" concerning the de facto parent's conduct. (*Ibid.*) "Although it is clear that de facto parents do not have all the substantive rights and preferences of legal parents or guardians, they have been afforded procedural rights in order to 'assert and protect their own interest in the companionship, care, custody and management of the child' [citation], and to 'ensure that all legitimate views, evidence, and interests are considered' by the juvenile court in dependency proceedings." (*Ibid.*)

Turning to this case, the juvenile court proceeding in which the court sustained the supplemental section 387 petition cannot be characterized as a contested hearing to resolve factual disputes. The juvenile court refused to allow Grandmother to present evidence or argument. Although her attorney attempted to represent her, the juvenile court eschewed his efforts, ultimately concluding Grandmother could present neither evidence nor argument. Grandmother had *no* opportunity to contest the allegations made against her. The petition "was not subjected to even the most minimal adversarial testing." (*In re Jonique W.*, *supra*, 26 Cal.App.4th at p. 698.)

On appeal, respondent does not counter the substance of Grandmother's arguments that she was a de facto parent and should have been allowed to address the court in the section 387 hearing. Instead, respondent argues that the juvenile court's rulings were harmless essentially for the same reasons that it argues the appeal is moot.

16

As set forth below in subsection C., we disagree that this appeal is moot. To recap, the evidence adduced—without any input from Grandmother—was far from compelling. The forensic examiner could not determine if Justin's bruises were accidental or the product of physical abuse, let alone physical abuse by Grandmother as opposed to Justin's doctor or cousin. The fact that nearly identical allegations against Grandmother of physical abuse of Justin were stricken in Shane's case supports our conclusion that the juvenile court's errors were not moot.

## C.    The Appeal is Not Moot

Two and a half years have passed since the juvenile court sustained the petition finding Grandmother physically abused Justin. In the context of the current appeal, Grandmother does not seek the return of the Children to her custody. Respondent argues that the appeal is therefore moot: "Nothing would be different now but for the alleged error." We disagree because respondent ignores the potential, serious consequences of sustained findings of physical abuse.

The sustained findings of physical abuse has ongoing consequences for Grandmother in that her visitation was severely restricted. The juvenile court limited her visitation with the Children to one hour a week with a monitor. The sustained finding could also affect her in the future. For example, in considering whether to place a child with a relative, the court is required to consider "[t]he good moral character of the relative and any other adult living in the home, including whether any individual residing in the home has a prior history of violent criminal acts or has been responsible for acts of child abuse or neglect." (§ 361.3, subd. (a)(5).) Additionally, the sustained finding of physical abuse may affect her ability to parent Shane

17

who remains in her care.  DCFS's assertions to the contrary, these are not speculative concerns.

## DISPOSITION

We reverse the juvenile court's order sustaining the supplemental section 387 petition.  We reverse the juvenile court's order denying Grandmother de facto parent status over the Children.  If the Los Angeles County Department of Children and Family Services files another section 387 supplemental petition containing allegations against Grandmother, Grandmother shall be allowed to appear at a contested hearing with court-appointed counsel and to present any relevant evidence.

CERTIFIED FOR PUBLICATION.


BENDIX, J.


We concur:



ROTHSCHILD, P. J.



WEINGART, J.*

---

*  Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

18