Filed 10/21/22 In re A.G. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.G., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E078294 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ2000589) |
| v. | OPINION |
| L.D. et al., | |
| Appellants. | |

APPEAL from the Superior Court of Riverside County. Cheryl C. Murphy, Judge. Affirmed.

John Vega for Appellants.

Minh Tran, County Counsel, Teresa K.B. Beecham and Larisa R-McKenna, Deputy County Counsel for Plaintiff and Respondent.

1

Appellants L.D. and R.D. (Cousins) are the maternal cousins of A.G. (female, born December 2019; Minor). Cousins appeal from the juvenile court's order denying their request for de facto parent status under Welfare and Institutions Code[1] section 395. For the reasons set forth *post*, we affirm the trial court's order denying Cousins' request.

## FACTUAL AND PROCEDURAL HISTORY

On September 30, 2020, Minor was detained from A.F. (Mother) and A.G. (Father; collectively, Parents). Riverside County Department of Public Social Services (the Department) placed Minor in Cousins' care.

Minor came to the attention of the Department due to allegations of physical abuse and general neglect by Parents. Due to an incident of domestic violence between Parents, law enforcement intervened; Mother was arrested and the Department detained Minor due to Parents' unresolved domestic violence and substance abuse issues.[2]

At the contested adjudication hearing on January 7, 2021, the juvenile found the allegations in the petition true and ordered reunification services and monitored visits for Parents. Minor remained in Cousins' care.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] Because this is an appeal by Cousins from the court's denial of their petition for de facto parent status, the record does not contain the initial petition for detention and other documents.

On July 8, 2021, at the contested six-month review hearing, Cousins were present. The juvenile court terminated Mother's reunification services and reduced her monthly visits to once a month. The court continued father's reunification services for an additional six months. The court also granted the Department discretion to liberalize Father's visits with Minor, including placement with father.

Moreover, the court found Minor's placement with Cousins to be appropriate. The Department reported that Minor was stable, safe, and loved by Cousins, who met her daily needs.

On October 27, 2021, the Department filed a report for the 12-month status hearing on November 10, 2021. In the report, the Department stated that on October 29, 2020, a Mental Health Screening Tool was completed on behalf of Minor; Minor did not meet the medical necessity for mental health services. Cousins, however, enrolled Minor in therapy due to nightmares; they claimed that Minor had nightmares on the days she visited with Father. The report stated that Father reported completing most of his services on his case plan. He had been cooperative and communicative with the Department. On September 30, 2021, a home evaluation was completed for Father. His visits with Minor progressed to unsupervised visits on October 18, 2021. The Department, based on Father's case plan compliance and stable housing, recommended that Father receive an additional six months of reunification services with a transition plan to return Minor to his care. The Department also noted that Minor was in a stable placement with Cousins. Minor was attached to and strongly bonded with both of them. Minor had a regular routine with Cousins, and her immediate medical, social, emotional,

and physical needs were met. Cousins also expressed their commitment to provide Minor with permanency should Father fail to reunify with her. A Child Family Team Meeting was initiated.

On November 10, 2021, at the 12-month review hearing, Cousins were present. Cousins filed a petition for de facto parent status. In the petition, Cousins stated that they had unilaterally decided to enroll Minor in therapy on September 20, 2021, after Minor was diagnosed with post-traumatic stress disorder (PTSD). The diagnosis was based on Cousins' reports to the therapist that Minor had strong emotional reactions and meltdown after visiting with Father. Cousins also reported that Minor returned from visits with Father hungry, thirsty, and with soiled diapers and clothing. Cousins hired a private investigator who informed Cousins that Father had been in contact with Mother. However, Father reported that Mother moved to Nevada, and the Department was not in contact with Mother. Cousins stated that they informed the Department about their concerns but the Department brushed them off and did not take their concerns seriously.

In an unannounced visit to Father's residence on November 12, 2021, the social worker observed that Minor appeared happy, affectionate, comfortable, and content with Father. The social worker observed that Father changed Minor's diapers twice during the visit. Moreover, Father provided crackers, chicken nuggets, and juice for Minor's lunch. At the end of the visit, Minor cried and reached out to Father.

On November 15, 2021, Cousins refused to take Minor to a scheduled visit with Father; Cousins stated that Minor had bug bites after returning from a visit with Father on November 12, 2021. Father denied any knowledge of having bugs in his home. He, however, set up a fumigation of his home that day. When the social worker attempted to arrange a visit between Minor and Father at the Department's office, Cousins became argumentative and rude. They eventually brought Minor to the visit but refused to transition Minor to the social worker. Moreover, Cousins asked the Department to reimburse them to fumigate their home. Father was only able to visit with Minor for half a day during the afternoon, even though he was scheduled to visit for a full day.

Social worker Tiffany Ross informed her supervisor, Rhonda Cordova, that Ross had conducted the supervised visits between Father and Minor for several months at the Department's office. Ross reported that Father was always attentive to Minor's needs, and had a strong bond with her. Ross also stated that Minor always looked comfortable when she was with Father. Ross told Cordova that Ross never observed any negative reactions from Minor when she was visiting with Father.

On November 4, 2021, the social worker spoke with Karlee Ohm, the therapist hired by Cousins. Ohm stated that based on Cousins' description of Minor's behaviors, Minor showed signs of PTSD. Ohm stated that Father needed to learn how to respond to Minor's trauma through his own therapist.

On November 18, 2021, at the contested 12-month status review hearing, the court continued the hearing to December 20, 2021. The juvenile court admonished Cousins for taking Minor to a therapist who was not approved by the Department or the court. The

5

court stated: "I wanted to speak with you briefly, because when I read the report for today and saw that the minor had been taken to a therapist, I had to reread it to see if that was a therapist that was approved by the Department or initiated by the Department for the need of the Minor. [¶] So I do want to remind you that with regard to the therapist, that would have to be approved by the Department or an order of the Court. And so it really—if you felt there was need to have the minor seen, it could be something that's spoken with with the child's social worker, and then a determination could be made if there needed to be an assessment to determine if the minor needed to have therapy." The court went on to tell the Cousins: "So I'm just reminding you that anything that you feel needs to be done with the minor child in terms of medical, any area, that does go through the Department and the social worker. And just a reminder too, that the parents are still—at least father is still in reunification. So that needs to be kept in mind, as well." The court then went on to reiterate that "reunification is in progress for the [Father]. And so the caregivers must abide by all of the orders and directive of the Department. [¶] So I will indicate that the caregiver cannot make a decision on their own to not allow for visitation that's been ordered by this Court."

On December 14, 2021, the juvenile court heard Cousins' request for de facto parent status, and denied their request.

## DISCUSSION

Cousins argue that "the court abused its discretion in denying [Cousins'] de facto parent status when it had very little evidence to deny their request."

" 'The concept of de facto parent has been judicially created to recognize limited rights in dependency cases for a person who has been found by the juvenile court to have assumed, on a day-to-day basis, the role of a parent, fulfilling the child's physical and psychological needs. [Citations.] The decision to grant de facto parent status depends on an assessment of the particular individual and the facts of the case.' " (*In re Justin O.* (2020) 45 Cal.App.5th 1006, 1015; see also Cal Rules of Court, rules 5.502(10) & 5.534.)

Courts have identified several factors relevant to whether a person falls within the definition of a de facto parent. Those factors include whether "(1) the child is 'psychologically bonded' to the adult; (2) the adult has assumed the role of a parent on a day-to-day basis for a substantial period of time; (3) the adult possesses information about the child unique from the other participants in the process; (4) the adult has regularly attended juvenile court hearings; and (5) a future proceeding may result in an order permanently foreclosing any future contact with the adult. [Citations.] If some or all of these factors apply, it is immaterial whether the adult was the 'child's current or immediately succeeding custodian.' " (*In re Patricia L.* (1992) 9 Cal.App.4th 61, 66-67, fn. omitted; see also *In re Bryan D.* (2011) 199 Cal.App.4th 127, 141; *In re Justin O.*, *supra*, 45 Cal.App.5th at p. 1015.)

The juvenile court makes its findings as to de facto parenthood by a preponderance of the evidence, and we review its findings for abuse of discretion. (*In re Leticia S.* (2001) 92 Cal.App.4th 378, 381.) We will not find an abuse of discretion unless the court "has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination." (*Ibid.*) " 'In most cases, the lower court

7

does not abuse its discretion if substantial evidence supports its determination to grant or deny de facto parent status.' " (*In re Jacob E.* (2004) 121 Cal.App.4th 909, 919.)

In this case, the parties and the juvenile court agreed that Cousins technically meet the requirements for de facto parent status. However, even where an individual may meet the requirements for de facto parent status, courts have found that in order "to qualify as a de facto parent, one must demonstrate that he or she cares about the child's well-being, desires to fulfill the child's needs, and intends to act ***in the child's best interests***." (*In re Jody R.* (1990) 218 Cal.App.3d 1615, 1627, boldface and italics added.)

Here, when Cousins filed their request for de facto parent status, they included unreliable and self-serving reports that Minor was having mental health issues and meltdowns after visiting with Father. Moreover, Cousins alleged that Minor returned from visits with Father with soiled clothing and diapers, hungry, and thirsty. Furthermore, Cousins accused Father of living in a bug-infested home because Minor suffered from bug bites after coming home from Father's home.

Contrary to Cousins' allegations, the social worker observed Minor enjoying her visits with Father, and noticed that Minor was both comfortable and bonded with Father. Additionally, during an unannounced visit by the social worker, the social worker observed Father as being prepared and appropriate with Minor, even though he had no notice that a social worker would be coming to the visit. The social worker also observed that Minor did not want to leave Father at the conclusion of the visit. Furthermore, there was no evidence of a bug infestation at Father's home. Nonetheless, Father fumigated his home.

The court and parties also observed that Cousins engaged in questionable activities that were not in the Minor's best interest. Cousins took Minor to their own therapist, not a therapist recommended by the Department or the court. Cousins told the therapist their own and personal observations of Minor. Based on Cousins' observations, their therapist diagnosed Minor with PTSD. Moreover, Cousins hired a private investigator to observe Father's activities.

At the hearing on December 14, 2021, the following transpired:

First, Father's counsel asked the court to deny the request. Father's counsel argued that the request "was filed with several pages of information that has no bearing whatsoever as to the health of the child." Moreover, counsel argued that "not only is the information not supportive of the request for de facto parent standing, which would really be just for the opportunity to have standing, limited standing, for the purpose of providing information as to health and safety of the minor[.] [¶] The motion goes well beyond that scope. And I believe based on the information, it shows that the de facto parents are actually making efforts to frustrate and prevent the reunification services process." Father's counsel went on to add that the information came "from sources that had not been vetted from the Department, including therapists that the [Cousins] did not have authorization to take the minor to."

Mother's counsel was present but stated that he had "no contact with [Mother] in quite sometime." Counsel, therefore, offered no comment.

Thereafter, the Department's counsel also asked the court to deny the motion. Counsel stated: "Yes, I believe the parents—the foster parents may qualify as a de facto

9

parent. But in this case, I believe the actions of the caretakers are that they're trying to stop the reunification or family maintenance of this father with his child." Counsel went on to note that although Cousins have stated that Father has failed to feed or care for Minor during visits, the social worker provided contrary information. "So I think at this time their action[s] are that they want to keep this child with them and not—and father not to have family maintenance services."

Minor's counsel then clarified that she believed that Cousins met the requirements for de facto parent status. She, however, agreed with the Department's counsel "that the paperwork [Cousins] filed goes well beyond the scope of what is necessary for de facto parent request. [¶] I think if the Court is to grant them de facto parent status, they need to be admonished and reminded of the fact that we are in reunification. Father has done a lot. There have been some issues that have come up that I've addressed with [Father's counsel] and with county counsel. I think they're working on that." Minor's counsel then asked for clarification that Minor should attend therapy "with the Department's therapist."

Thereafter, Cousins' counsel argued that Cousins should be granted de facto status. She stated that Cousins "have had the child in their care for most of the child's life. The child is bonded to them. They have provided information to the Court that no one else has. And the reason no one else has it is that they keep telling the social worker about things that are happening, and the social worker happens to dismiss them. This is what everybody [] else is call thwarting reunification." Counsel then went on state that her clients have informed the Department about Father having contact with Mother and

10

about his live-in girlfriend, because of their concern for the safety of Minor. Counsel also argued that "in their placement agreement, it says that they can get therapy for the minor. So they have not acted beyond what they are supposed to do. They have provided excellent care for this child."

The Department's counsel responded: "I think counsel's argument goes directly to the point made, that their interest here goes beyond the scope of being de facto parents, which is very limited. They can only give information regarding their knowledge of this minor's health in their care."

After continued argument from counsel, the court stated: "I think I heard quite a bit from all counsel on this matter." After going through the facts discussed regarding Cousins' request, the court stated: "So while this Court believes that in a general respect the caregivers do meet the de facto parent status, the Court does not find it to be in the best interest of the minor child to actually grant the status and believes that if I do, that would provide more impetus to the caregivers to continue on their path of trying to do what they can to ensure that father perhaps does not reunify with this minor child, and that minor could remain in their care and perhaps have permanency with the caregivers." Therefore, the court denied Cousins' request and set a contested hearing for December 20, 2021. Moreover, the court directed that Minor continue therapy with a therapist chosen by the Department, if necessary.

Based on the above, we find that there is substantial evidence to support the court's finding it was not in Minor's best interest to grant Cousins' request for de facto parent status. We can see that Cousins love Minor and did what they believed to be in

11

*their* best interest—the combine interests of Cousins and Minor. However, there was ample evidence that showed Cousins were not looking out for the best interest of Minor's reunification with Father. Under the Welfare and Institutions Code, "the purpose of the provisions of this chapter relating to dependent children, is to provide maximum safety and protection for children who are [abused and neglected] . . . the focus shall be on the preservation of the family as well as the safety, protection, and physical and emotional wellbeing of the child." (§ 300.2.) Here, substantial evidence supports the court's finding that Cousins were "trying to do what they can to ensure that father perhaps does not reunify with this minor child, and that minor could remain in their care and perhaps have permanency with the caregivers."

We note that Cousins argue there was no "clear evidence" that they tried to thwart father's reunification efforts. As a reviewing court, however, we do not rely on "clear evidence." The California Supreme Court stated when a reviewing court is determining whether the lower court's decision exceeded the bounds of reason, "[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." (In *In re Stephanie M.* (1994) 7 Cal.4th, 295, 318-319.) Here, there was ample evidence for the juvenile court to make its finding.

Based on the foregoing, we find that the juvenile court did not abuse its discretion in denying Cousins' request for de facto parent status.

## DISPOSITION

The juvenile court's order denying Cousins' request for de facto parent status is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
Acting P. J.

We concur:

CODRINGTON
J.

RAPHAEL
J.