Filed 10/15/25  D.O. v. Superior Court CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| D.O. et al., | |
| Petitioners, | E086388 |
| v. | (Super.Ct.Nos. J293829, J293830, J293831 & J293832) |
| THE SUPERIOR COURT OF SAN BERNARDINO COUNTY, | |
| Respondent; | OPINION |
| SAN BERNARDINO COUNTY CHILDREN & FAMILY SERVICES, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petitions for extraordinary writs.  Annemarie G. Pace, Judge. Petitions denied.

Vincent W. Davis for Petitioner D.O.

Valerie Ross for Petitioner R.H.

No appearance for Respondent.

1

Tom Bunton, County Counsel, and Helena C. Rho, Deputy County Counsel, for Real Party in Interest

D.O. (father, to distinguish from the child with the same initials) and R.H. (mother) each filed a petition for an extraordinary writ after the juvenile court terminated family reunification services and set a Welfare and Institutions Code section 366.26 hearing.[1]  Father contests the placement of the minors, the jurisdictional findings against him, that he was provided reasonable reunification services, and that the caregiver received de facto parent status.  Mother disputes the court's finding that returning the children to her would be detrimental to them.  We deny the petitions.

BACKGROUND

**A.  Initial Proceedings**

Mother and father share four male children who are the subjects of the dependency proceedings underlying these writ petitions:  D.O. (born 2015), G.O. (born 2017), S.O. (born 2018) and T.O. (born 2019).

In June 2022 the children's younger half sister was hospitalized for severe malnutrition.  All the children were living with mother at the time.  In July, San Bernardino County Children & Family Services (the department) removed the four boys from mother's care and placed them with father.  That same month the department filed a petition under section 300, subdivision (j), as to each of the four boys, alleging abuse of their sibling.  In its jurisdictional/dispositional report the department recommended the

_____

[1] Unlabeled statutory citations refer to the Welfare and Institutions Code.

2

petition be sustained, the children remain with father, that father receive family maintenance services, and that mother receive family reunification services. Father lived with his now wife (stepmother) and the children's older stepsiblings.

At the jurisdiction/disposition hearing in October 2022, the juvenile court followed the department's recommendations.

In a status review report filed in March 2023, before the six-month review hearing, the department recommended the children be jointly maintained between the parents, and the dependency continued. However, there was some friction between father and mother, as well as between father and the department. Father expressed frustration that mother was allowed unsupervised visits, and that "he does all the work for the children; the mother has no responsibilities." He also drove by mother's home while the children were at her home for overnight visits, and the department received a number of anonymous calls concerning both this behavior and father allegedly approaching neighbors to ask them to "spy" on mother. Father was also late for dropoffs and often tried to argue with mother, though mother remained silent.

The children expressed some concerns about their placement with father. They disliked sharing a room with their stepsiblings, and reported that "some of their big brothers are mean to them, [and] hit them." They told their stepmother, but not father, because he "has lots of jobs [and] is always at work or . . . is gone some where far with" their stepmother.

At the six-month status review hearing in April 2023 the court ordered the parents share parenting time and ordered family maintenance services for both.

In August 2024, mother sought a restraining order against father. She alleged father was harassing and stalking her. She alleged he drove around her neighborhood during her visits, talked to her neighbors, tried to harass her during exchanges, and followed her after exchanges. The inciting incident for seeking the restraining order was finding an Apple AirTag in one of her son's shoes, which she believed father placed there to track the child. Mother also alleged exchanges were not peaceful despite happening at a police station, and that father frequently brought stepmother, who would also harass mother. Mother further alleged that much of this harassment occurs while the children are present. The court denied the request for a temporary restraining order on the basis that nobody's physical safety was under immediate threat, but set the request for a restraining order for hearing. At the hearing the court denied the request for a restraining order, but ordered the parents and stepmother not to discuss the case with the children or disparage each other, nor use any tracking devices.

In October 2023 the department filed a status review report in which it recommended the matter be continued. The parents had participated in coparenting couple's therapy, but had difficulty behaving amicably. For instance, the department reported sometimes children would be left without "proper clothing or shoes" after leaving a parent's house, because the parent was "being petty," and that when one of the children was sick, the parents would refuse to share the necessary medication. The

4

children also reported that they did not like it when the parents said "yucky" things about each other.

The court held a review hearing that same month, where it ordered continuing family maintenance services and additional individual counseling. It also reiterated its prior orders forbidding disparaging remarks about the other parents and told the parents "I want to warn you both: This isn't family law court. The difference is I can remove these kids from both of you, and I will if I have to . . . . [¶] So you need to work together."

## B. Subsequent and Supplemental Dependency Petitions

A social worker observed the children on January 7, 2024. The social worker noted that S.O. had a swollen cheek and jaw, but that he was not bruised. S.O. did not report anything about mother hitting him.

Two days later the department received a referral alleging mother physically abused S.O. because he had a swollen cheek and jaw when father took over custody of him. Mother said she was aware of the issue, had already taken S.O. to urgent care, and that urgent care said it was a tooth abscess. However, S.O. told the reporting party that he got in trouble for stealing candy, and that mother took him into the garage, punched him in the face, and locked him in for an indeterminate period of time. The other children reported they saw mother take S.O. into the garage but did not see her hit him. Father alleged that mother provided him with a doctor's note and told him to follow up with a dentist, but when he did the dentist did not discover any signs of a tooth infection.

5

He said he then took S.O. to the emergency room, where they reported he did not have any fractures but did have "soft tissue damage" consistent with being hit in the face. Father did not have any medical records of this visit at the time, but had pictures of S.O.'s cheek and jaw. Father refused to turn the children back over to mother.

On January 12, the same social worker who observed the children on January 7 saw them again, and reported they "were cold and looked terrified," whereas they are normally "hyperactive and warm." D.O. reported unprompted that mother " 'spanked my brother and punched him in the face, and they were in the garage,' " which the social worker found odd. The social worker believed the children were being coached and did not believe mother hit S.O. The social worker also reported that father insists the children call mother by her first name when at his house, that both father and stepmother disparage mother, and that the children sometimes make disparaging remarks about mother unprompted and without being able to explain what they mean. The social worker said she felt the children needed to be removed because the parents could not coparent, and the referrals would continue until they were removed.

The department spoke to the children on January 16. All of the children, save S.O., said mother punishes them with timeouts and denied any physical discipline. S.O. told them mother hit him in the face, and that his mother sometimes puts him in the garage when he breaks rules. He denied any other instances of physical discipline, and insisted that he told " 'dad's doctor' " the truth about mother hitting him despite not saying anything to the first doctor he saw. D.O. said that S.O. complained of cheek and

6

tooth pain before the alleged incident, and that mother and maternal grandmother (MGM) told him it was something wrong with S.O.'s tooth. All the children, save S.O., denied seeing mother hit S.O. D.O., S.O., and G.O. confirmed they must call mother by her first name at father's house.

The department asked father to send photos of S.O.'s alleged injuries, and noted that they appeared altered. According to the department, father also accidentally sent the unaltered picture as well, and the metadata for the photos indicated the allegedly altered photo was a screenshot while the allegedly unaltered one was taken by a camera, further indicating manipulation. Father provided a dental note corroborating that there was no tooth abscess. Finally, father sent a video to a social worker where he was asking S.O. leading questions and S.O. was repeating what he said.

The next day, the department removed the children from both parents due to concerns about physical abuse by mother and emotional abuse—including coaching—by father. The children were placed with MGM. The department then filed a petition under sections 342 and 387 alleging the children came under section 300, subdivisions (b), (c), and (j). The new petition alleged the children were at substantial risk of abuse or neglect and were "suffering serious emotional damage," because they had been "exposed to an unrelenting struggle between the parents." The petition with respect to S.O. also included an allegation under subdivision (a), that mother "utilize[d] inappropriate and excessive discipline[] techniques including . . . punching the child in the face." Finally, the supplemental petition alleged family maintenance was no longer appropriate because

7

mother used inappropriate physical discipline and both mother and father placed the children "in the middle of a custody dispute causing emotional stress."

### 1. Jurisdiction/Disposition

The department filed a jurisdictional/dispositional report in February 2024 before the hearing on these new petitions. The department reported that father was highly critical of mother and believed all of the allegations against her were true, and he was also critical of the department and court for permitting unsupervised visits. He said the department was only involved in his life because of mother, and that he was going to request a new social worker. The department prepared an addendum to this report in March 2024, and reported that the children said father and stepmother do not like mother and the feeling is mutual. They said when at father's house he and stepmother "ask them questions about [their] mom all day long," that they do not like answering these questions, and that they do not like that their parents do not get along. Finally, in April the department filed an additional information where MGM reported three incidents where she claimed father harassed her after visits. The first involved father allegedly blocking her car in and recording her while he and stepmother yelled at her while the second, which a social worker observed, involved father waiting outside for MGM, making MGM fearful to leave and compelling the social worker to offer her an escort to her car. Finally, MGM claimed father waited for her to leave with the children and followed her out of the parking lot. Father denied any of these incidents happened or that he was harassing MGM.

8

The court held a jurisdiction/disposition hearing in April 2024.  The parents agreed to admit certain of the allegations in the petitions in exchange for dismissing other.  Specifically, mother admitted using inappropriate physical punishment on the children, while both mother and father admitted they caused the children emotional distress by putting them in the middle of their custody dispute.  The court ordered reunification services for both parents.

Father appealed, arguing substantial evidence did not support the removal order.  (*In re T.O.* (Mar. 28, 2025, E084173) [nonpub. opn.] (*T.O.*).)  We affirmed, finding there was "substantial evidence father engaged in behavior that either caused emotional harm or risked emotional harm to the children." (*Ibid.*)  That, combined with his "lack of insight" regarding "his part in creating and maintaining the parents' animus toward each other," "provided an ample basis for the juvenile court's order removing the children from his care." (*Ibid.*)

2. *Six-Month Status Review*

In October 2024 the department prepared a report before the six-month status review hearing where it recommended continuing reunification services.  The department reported that recent efforts to contact father had been unsuccessful.  Mother, on the other hand, showed "a degree of compliance," but tended to minimize her substance use issues.  The parents both tended to "focus on their individual challenges, rather than prioritizing the well-being of their children."

During the reporting period the children showed signs of severe emotional distress. D.O. "struggle[ed] with managing his emotions and ha[d] difficulty processing feelings effectively." G.O. "constantly worrie[d] about being perceived as good and tend[ed] to prioritize pleasing others," and also showed "difficulty in articulating his feelings." S.O. was physically aggressive towards caregivers and at school, lacked appropriate boundaries, and struggled to focus. T.O. was throwing tantrums, hitting, biting, and had difficulty being redirected. Though things improved in MGM's care, there was still underlying emotional turmoil. The children believed their behavior caused the removal, and were concerned about the relationship between mother and father.

Visitation also continued to be fraught. Father brought stepmother to a visit and insisted the children call her mom, even though all the children said they did not want her present and all but S.O. said they did not want to call her mom. On another occasion the father repeatedly asked the children about school in a way that distressed them, and continued to do so even after D.O. told father he did not want to talk about it. Both father and stepmother struggled to redirect the children, but father tended to perform better when stepmother was present "as she interacts with the children and helps facilitate engagement." Father was observed making disparaging remarks and commenting about mother and grandmother's caregiving choices, which the department believed harmed the children's well-being. The children also showed significant distress both before and after visits with either parent.

At the status review hearing the court ordered stepmother not to be present for visits and clarified that father was supposed to participate in random drug testing. It also ordered father to participate in additional individual counseling to address coparenting and anger management issues. It otherwise continued reunification services.

*3. 12-Month Status Review*

In February 2025 the department filed a status review report that recommended the court terminate father's reunification services, but give mother an extended visit to see if she could transition to family maintenance services. Father had continued to act in ways detrimental to the children's emotional well-being. For example, at visits he showed videos of the children's stepsiblings encouraging them to "come home soon" and confusing and distressing the children. Father was encouraged to work with a parent partner to address these concerns, but did not do so.

The children continued to show significant emotional distress, especially around visits. They said they feared father speaking negatively about mother, and mother and father continuing to not get along. D.O. was anxious, distressed, and frequently asked when visits would end  G.O. showed anxiety—manifesting in physical symptoms like stomachaches—and exhibited negative behaviors like fighting with his siblings. S.O. exhibited aggressive, deceitful, destructive, and even self-harming behaviors. T.O. had frequent tantrums. All four children's behavior was particularly concerning before and after visits with father.

11

The department did not have updated information about father's participation in services, but mother made significant progress in hers. Father missed five drug tests but tested negative on seven, while mother only missed one and tested negative on all of them. Both participated in parenting classes and additional individual therapy. While mother reported benefiting from these services, father did not report at all.

At a hearing held in March 2023 the court ordered both parents to participate in conjoint therapy.

### 4. 18-Month Status Review

The department in April 2025 updated its recommendation to also terminate reunification services for mother. Father did not participate in family therapy, and mother's therapist reported that though she presented well "she appears to be 'checking off boxes' and has not demonstrated full honesty or accountability." Meanwhile, the children's behavior was getting worse, with G.O. experiencing his first panic attack, and all of the children becoming increasingly dysregulated and aggressive. The children's mental health services were also becoming decreasingly effective, and a member of their mental health services team "emphasized that the children are unlikely to benefit from continued services without addressing the underlying emotional distress linked to ongoing contact with their parents." The department thus recommended discontinuing family therapy—which seemed to make the children's issues worse—and "assessed [that] continued contact with the parents [was] detrimental to the children's emotional well-

12

being." The department opined that "[t]he severity and persistence of the behavioral issues strongly indicate that reunification is not in their best interest."

At the next hearing, the court suspended visits and set a contested review hearing.

After the court terminated visits with the parents the children's behavior seemed to improve. Father expressed his view that their behavioral issues did not begin until placement with the MGM. Both parents continued to participate in services.

On June 3, 2025, MGM filed a request to be designated a de facto parent. The court eventually granted this request.

The court held a contested review hearing on June 11, 2025. The children testified via out-of-court answers to pre-prepared questions. Each of them said they loved mother and wanted to live with her. All of the children except T.O. said they loved father and wanted to live with him. However, T.O. said he did not want to live with father, and T.O., G.O., and D.O. reported that they did not feel safe living with father—though G.O. and D.O. specified this was only because of their stepsiblings, and that they felt safe with just father. The children had universally positive things to say about MGM.

The social worker testified father completed his case plan, but that he did not benefit from services, "show[ed] no accountability [for] his actions," and deflected blame on to the department and MGM She also testified that father disparaged MGM to the children and spoke to the children about their stepsiblings, neither of which was permitted. With regards to mother, the social worker said mother had not benefited from services, as she struggled with alcohol, resisted treatment, and insisted she did not have a

13

problem. Family therapy sessions with mother did not go well, and mother did not use any of the parenting skills she was supposed to have learned during visits.

Father testified but was evasive in his answers. For instance, when asked whether one of the issues of concern to the court was emotional harm to the children he responded "that was stated" and when asked whether his conduct caused that emotional harm he responded "the emotional harm that was stated in this case is based a lot on the interaction between myself and the children's mother." He claimed that though he and mother had issues he "was never mad at her, never upset with her," and "always tried to work with her." When asked what he did wrong, father responded "I believe it was a lack of communication and the wrong type of communication." He also denied doing anything wrong regarding the doctored pictures of S.O. he provided to the department. Finally, when asked whether he believed the children were removed because of something he did, father answered "[n]o. I mean, every action has a consequence."

Mother testified that she did benefit from services, and that her therapist may have concluded otherwise only because she was not good at expressing herself. She also denied physically disciplining her children.

After hearing evidence and argument, the court stated its concern that mother's therapist reported she was just checking boxes as "that's the time to really demonstrate that you are able to communicate with your children." It also felt that her alcohol use issues were not resolved, and therefore she had not "fully benefitted from services." For father, the court stated that "it is not enough to say 'I'm accountable.' You have to

14

describe how you are accountable." The court also said father's numerous communication issues with the children demonstrated that he failed to recognize the emotional impact he was having on them, and that he was being "extremely emotionally damaging and manipulative." The court found father, too, had not benefited from services.

Accordingly, the court terminated reunifications services for both parents and set a permanency planning hearing under section 366.26.

DISCUSSION

Father argues (1) that the trial court erred when it determined not to return the children based on father's alleged substance abuse, (2) that he was a nonoffending parent and the children should have been placed with him, (3) the court erred by granting MGM's request to be designated a de facto parent, and (4) that he was not provided reasonable reunification services. Mother argues only that the court's findings that she caused the children emotional distress were unsupported by substantial evidence. We reject each of these arguments.

## A. Father's Petition

### 1. *The Court Did Not Find Father Abused Substances*

First, the court did not terminate reunification services due to father's substance abuse but due to his failure to benefit from services. The court stated it was concerned that father showed little understanding of the harm he caused his children and no accountability. The court did not raise substance abuse concerns with regard to father,

15

only mother.  Indeed, the petitions never even alleged substance abuse by father.  This argument is therefore inapposite.

### 2.  *Father has Already Litigated and Lost his Placement Challenge*

Father's argument that the children should have been placed with him as the nonoffending parent is similarly unavailing.  We rejected this argument in his first appeal, and we have no reason to reconsider our analysis whether because collateral estoppel applies—as the department argues—or because our previous analysis remains correct.  (See *In re T.O., supra,* E084173.)

### 3.  *The Trial Court Did Not Err Granting MGM De Facto Parent Status*

We turn next to father's challenge to the designation of MGM as a de facto parent. The department argues parents lack standing to challenge another person's designation as a de facto parent, citing *In re Crystal J.* (2001) 92 Cal.App.4th 186, 190 and *In re Daniel D.* (1994) 24 Cal.App.4th 1823, 1835-1836.  However, both cases involved parties appealing an order *denying* de facto parent status to a third party.  Parents may challenge decisions to *grant* de facto parent status.  (See, e.g., *In re Giovanni F.* (2010) 184 Cal.App.4th 594, 597, 601-602.)  We therefore address father's arguments on the merits.

De facto parent status "merely provides a way for the de facto parent to stay involved in the dependency process and provide information to the court."  (*In re Bryan D.* (2011) 199 Cal.App.4th 127, 146 (*Bryan D.*); see *In re Brianna S.* (2021) 60 Cal.App.5th 303, 314 ["Designating a person as a de facto parent gives that person '*procedural* rights' in the ongoing dependency proceedings, such as the right to be

present at hearings, to be heard and to retain counsel, but de facto parent status does not grant the person any *substantive* rights to 'reunification services, . . . custody, [or] continued placement of the child.' "].)  "A person requesting de facto parent status has the burden to show by a preponderance of the evidence he or she qualifies for that status." (*In re Abigail L.* (2022) 75 Cal.App.5th 169, 178.)  "[F]actors relevant to the decision . . . include whether (1) the child is 'psychologically bonded' to the adult; (2) the adult has assumed the role of a parent on a day-to[-]day basis for a substantial period of time; (3) the adult possesses information about the child unique from the other participants in the process; (4) the adult has regularly attended juvenile court hearings; and (5) a future proceeding may result in an order permanently foreclosing any future contact with the adult." (*In re Patricia L.* (1992) 9 Cal.App.4th 61, 66-67.)

We review a juvenile court's decision on a request for de facto parent status for abuse of discretion.  (*In re Michael R.* (1998) 67 Cal.App.4th 150, 156.)  But "[d]e facto parent status is ordinarily liberally granted on the theory that a court only benefits from having all relevant information on the best interests of the child." (*Bryan D.*, *supra*, 199 Cal.App.4th at p. 141.)

The court did not abuse its discretion in designating MGM as a de facto parent. MGM has been the children's caregiver since they were removed from father.  She has had day-to-day caregiving duties, and the children appear psychologically bonded to her. They saw significant emotional benefits after visits with their parents were terminated and while in MGM's care.  She has kept apprised of the proceedings and attended many

17

of them.  MGM easily meets the threshold for being designated a de facto parent, and the court did not abuse its discretion by granting her that status.

### 4.  *Father Received Reasonable Reunification Services*

Finally, father argues he was not given reasonable reunification services.  When a court orders reunification services, the department must ensure the provided services are reasonable.  (§ 361.5, subd. (a); *Earl L. v. Superior Court* (2011) 199 Cal.App.4th 1490, 1501.)  Whether reunification services offered were reasonable is judged according to the circumstances of the particular case.  (*Earl L.*, at p. 1501.)  "The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances."  (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)  Any reunification plan "must be specifically tailored to fit the circumstances of each family [citation], and must be designed to eliminate those conditions which led to the juvenile court's jurisdictional finding."  (*In re Dino E.* (1992) 6 Cal.App.4th 1768, 1777.)

The court's reasonable services finding "must be made by clear and convincing evidence in the trial court."  (*T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1238.)  We review a finding that reasonable services were provided or offered for substantial evidence.  (*Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 598.)  "In general, when presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of

18

fact could have made the finding of high probability demanded by this standard of proof." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.) In other words, "the question before a court reviewing a finding that a fact has been proved by clear and convincing evidence is not whether the appellate court itself regards the evidence as clear and convincing; it is whether a reasonable trier of fact could have regarded the evidence as satisfying this standard of proof." (*Id.* at 1009.)

Father does not argue how the department failed to provide reasonable reunification services, nor why the court's finding it did was not supported by substantial evidence. Instead, he asserts generally that, "[a]s shown above, the Juvenile Court erred when it found that reasonable services were offered," to him and that "[d]espite the minimal referrals" he completed his case plan. (See *In re J.M.* (2023) 89 Cal.App.5th 95, 114-115 [declining to consider a point which appellant failed to support with reasoned argument.].) Moreover, we find nothing in the record suggesting the department failed to provide reasonable services. (See *Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 545-546 ["We are not required to search the record to ascertain whether it contains support for [a party's] contentions.].) The primary barrier to reunification was father and mother's inability to co-parent, including father's emotional abuse of his children to fuel his ongoing feud with mother. Thus, the department provided parenting classes and individual and joint counseling. This is exactly what the department should have done, and father fails to identify anything more he wishes it would have done.

Accordingly, we conclude sufficient evidence supported the court's finding that the department provided reasonable reunification services.

We therefore deny father's writ petition.

**B.    Mother's Petition**

Mother argues the court's finding she contributed to the emotional harm to her children was not supported by substantial evidence. We understand her to contest the sufficiency of the evidence underlying the court's finding that returning the children to her would be detrimental. The argument lacks merit.

At the 18-month permanency review hearing "the court shall order the return of the child to the physical custody of [his or her] parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to [his or her] parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.22, subd. (a)(1).) "The failure of the parent or legal guardian to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental." (*Ibid.*) However, " 'simply complying with the reunification plan by attending the required therapy sessions and visiting the children is to be considered by the court; but it is not determinative. The court must also consider the parents' progress and their capacity to meet the objectives of the plan; otherwise the reasons for removing the children out-of-home will not have been ameliorated.' " (*Georgeanne G. v. Superior Court of Los Angeles County* (2020) 53 Cal.App.5th 856, 867 (*Georgeanne G.*).)

"When the sufficiency of the evidence to support a juvenile court's finding or order is challenged on appeal, the reviewing court must determine if there is substantial evidence, contradicted or uncontradicted, that supports it." (*In re Albert T.* (2006) 144 Cal.App.4th 207, 216.) "Under that standard we inquire whether the evidence, contradicted or uncontradicted, supports the court's determination. We resolve all conflicts in support of the determination, indulge in all legitimate inferences to uphold the findings and may not substitute our deductions for those of the juvenile court. [Citations.] However, '[s]ubstantial evidence is not synonymous with any evidence. [Citation.] To be substantial, the evidence must be of ponderable legal significance and must be reasonable in nature, credible, and of solid value.' " (*Georgeanna G.*, *supra*, 53 Cal.App.5th at p. 865.) We review the juvenile court judge's finding there is no substantial probability of return and decision to terminate reunification services for substantial evidence. (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688.) The same is true for the finding of detriment. (*Georgeanne G.*, at p. 864.)

Here, substantial evidence showed that returning the children to mother's care would be detrimental. After the department recommended returning the children to mother, their emotional health deteriorated. The children's therapists opined that this was caused by their continuing contact with both parents and their parents' ongoing conflict, and it would not be resolved without ceasing contact with the parents. Indeed, the children's emotional well-being improved after visitation ended. Mother's participation in family therapy with the children only made things worse. Her therapist believed she

21

lacked insight into her role in the children's emotional turmoil, suggesting she failed to appreciate how she contributed to the conflict. Finally, the social worker testified that at visits mother "does not redirect the children or use any of the parenting skills that she's learned," and mother's therapist felt she was merely going through the motions.

There was ample evidence for the court to conclude that mother has not benefited from services, and that returning the children to her care would be to their detriment. Accordingly, we will deny mother's writ petition.

## DISPOSITION

Mother and father's petitions for extraordinary writs are both denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL
J.

We concur:


McKINSTER
                Acting P. J.


FIELDS
                J.

22